SIEGEL ET AL., APPELLANTS, *v.*
MT. SINAI HOSPITAL OF CLEVELAND ET AL., APPELLEES.

(No. 36938—Decided November 9, 1978.)

*Mr. Jerry E. Dempsey* and *Mr. Carl G. McMahon,* for appellants.

*Mr. Michael R. Gallagher* and *Mr. Alan M. Petrov,* for appellees Arnold S. Gale, M.D., and Cleveland Anesthesia Group, Inc.

*Mr. Mario C. Ciano,* for appellee Alvyn W. Tramer, M.D.

PRYATEL, J. This case concerns a claim for medical malpractice. The suit was filed by Marilyn Siegel, the widow of Shael Siegel and the executrix of his estate, claiming damages for the wrongful death of her husband as well as for his pain and suffering.

The case proceeded against the following defendants: Mt. Sinai Hospital, Dr. Alvyn W. Tramer, Dr. Arnold S. Gale, Dr. Sidney Katz and Cleveland Anesthesia Group, Inc. The trial of the suit commenced on May 24, 1976. At the conclusion of plaintiff's case, motions for directed verdicts were granted to defendants, Mt. Sinai Hospital, Dr. Alvyn W. Tramer, and Dr. Sidney Katz. The case continued as to Dr. Gale and Cleveland Anesthesia Group, Inc. The jury returned a verdict in their favor on June 3, 1976, and a judgment was entered on June 7, 1976. The plaintiff filed a motion for a new trial which was overruled in August 1976. A timely appeal from the ruling brings the case before us.

Shael Siegel, a 45 year old veteran, who had a history of asthma, was active in sports and had no heart problems.

On Sunday morning, November 19, 1972, he was playing tennis when he felt pain in his right ankle, after which he could not support his weight on his right foot. His tennis partner immediately drove Siegel to the emergency room of Mt. Sinai Hospital where he was examined by Dr. Alvyn W. Tramer, an orthopedic physician and surgeon. He diagnosed a ruptured Achilles tendon of the right ankle and recommended surgical repair of the tendon. Since it was not an emergency and it was a Sunday, and Siegel wanted to take his son, Scott, to the Brown's football game, Siegel was fitted with a short walking cast with the understanding that he would return the following day for surgical repair. After he informed Dr. Tramer of his (Siegel's) asthmatic condition, which was noted in the hospital record, Dr. Tramer authorized him to take his nebulizer[1] with him when he reported to the hospital.

---

[1] A nebulizer is a spray with a rubber bulb attached. Medication is put into the receptacle and when squeezed, the fluid that is put into this apparatus is sprayed either into the throat or nose.

Siegel returned to the hospital on November 20, with surgery scheduled for the morning of November 21. On the evening of November 20, Dr. Tramer visited Mr. Siegel in his hospital room. Dr. Tramer testified that he had no notion of any danger in the contemplated surgical procedures. He did not mention any surgical risk because of the patient's asthma, nor did he advise regarding any complication anticipated from the administration of anesthetics to an asthmatic.

Defendant Gale, an employee and officer of the defendant Cleveland Anesthesia Group, Inc., was the anesthesiologist for Siegel's surgical procedure, and was aware of Siegel's asthmatic condition.

Asthma is a disease of the lungs which causes the windpipe and muscles around the bronchial tubes leading to the lungs to constrict during an asthmatic attack. When the smooth type muscles encircling the bronchial tubes constrict, they close down the tubes so that less and less air passes through them. This constriction of the bronchial tubes is known as bronchial spasm or bronchospasm. During a severe bronchial spasm there is a complete closing of the bronchial tubes, blocking any air from reaching the lungs. A bronchial spasm is part and parcel of an asthmatic attack.

On the morning of November 21, Dr. Gale had a brief discussion with Mr. Siegel before the administration of the anesthetics, but did not mention the risk of the drugs. The preoperative drugs administered that morning for anesthetic purposes were seconal, a barbiturate used for sedation, scopolamine, used to dry up the secretions of the mouth and to protect the circulation against a slow pulse, and solocortoff, a cortizone product used because the patient had asthma. Before the spinal anesthetic was administered Dr. Gale gave diazepam (valium), a relaxant or tranquilizer which had a small depressant effect. To induce anesthesia, procaine (novocaine) and tetracaine were used which he advised Siegel would numb him from the waist down. Dr. Gale also told him that he would be placed on his face during the operation.

A general anesthesia was not given since it would have rendered the patient unconscious, making it necessary to place an endotracheal tube in the trachea to maintain respiration.

Following the spinal induction and with the surgery coming up, anileridine was administered as a sedative to potentiate

the sedative effect of the diazepam. Anileridine is a narcotic which depresses the respiratory system.

Some twenty-five minutes after the induction of anesthesia, the surgical procedure commenced. Dr. Tramer conducted the surgery, assisted by orthopedic residents, Drs. Kuen Lee and Peter Sripaipan. According to Dr. Gale, Siegel was apprehensive and restless during the surgery and moved his upper body about the operating table. Dr. Tramer indicated that the patient was draped for sterility so his head could not be seen. To calm the patient, Dr. Gale administered sedatives in small and repeated doses, a technique known as "titration." This permits an anesthesiologist to observe the effect of the particular drug on the patient.

Because the many doses of valium were not having any effect, droperidol was given to calm the patient. According to Dr. Gale, droperidol is a tranquilizer and a depressant. Dr. Gravenstein (appellees' expert) classified droperidol as one of the more effective major tranquilizers. He believed that anileridine and droperidol had a depressant effect on the patient's breathing. Since the patient was still agitated, Dr. Gale then administered thiopental (sodium pentothal).

Dr. Viljoen (appellants' expert) considered everything appropriate prior to the administration of the thiopental (sodium pentothal). Dr. Viljoen testified that thiopental can cause constriction of the bronchia and can depress respiration. Dr. Mendelsohn testified "it is thought to produce some bronchoconstriction." Dr. Gravenstein believes it is a drug that constricts rather than dilates bronchial tubes. Nevertheless, to Dr. Gale, thiopental does not routinely have a constricting effect.

Siegel settled down shortly after pentothal was administered to him, but a slight cyanosis[2] appeared in the area of his face and neck. Dr. Gale testified that he placed a small plastic disposable oxygen mask to Siegel's face after the injection of the thiopental when "I was greatly concerned about him. * * *" He increased the flow of oxygen to the mask, but it did not cause the cyanosis to abate. According to Dr. Gale, all

---

[2] Cyanosis, according to Dr. Gale, is a discoloration of the skin or color of the patient who takes on a bluish hue. General cyanosis, according to Dr. Gale, indicates a problem of bringing oxygen to the body tissue due to either a problem with respiration or circulation. Regional cyanosis occurs when the blood is not flowing normally, but rather is "flowing very sluggishly or not flowing at all."

the patient's vital signs were normal, including the breathing sounds that he monitored with a stethoscope. Dr. Gale testified that after the appearance of the cyanosis, Siegel's breathing, pulse, and circulation all ceased simultaneously. According to Dr. Gale there was an emergency, causing the doctors to turn Siegel on his back and to begin cardiac massage as they attempted to restore ventilation. Siegel became vividly cyanotic. Dr. Tramer testified that the major part of the operation had been completed, and that Mr. Siegel never interfered with the procedure for it went smoothly and routinely until the emergency. Dr. Gale reported:

"[I]t turned out subsequently that he had a bronchial spasm.***I didn't know immediately what it was."

He stated that he also had a circulatory arrest—popularly called a cardiac arrest. Dr. Gale removed the disposable oxygen mask, and placed an anesthesia mask over Siegel's nose and mouth and tried to force oxygen into Siegel's lungs, but was unable to do so because Siegel's bronchospasm completely constricted his breathing passage. Dr. Katz, Chairman of the Mt. Sinai Department of Anesthesia, who was on duty as a circulator to respond to emergencies, immediately recognized the bronchospasm and promptly administered an ampule of isuprel, a drug which relaxes the involuntary muscles of the body including those that constrict the breathing passages. He injected isuprel twice the strength of a normal dose. Shortly afterwards, Siegel's bronchospasm was broken and his respiration and pulse returned. Some two hours after the operation began, he was wheeled to the surgical intensive care unit of the hospital. Unfortunately, the bronchospasm deprived him of oxygen a sufficient time to cause permanent and irreversible brain damage. He continued to deteriorate and was transferred to Veterans Administration Hospital where he died in April of 1973, some five months after he came to the hospital for an operation on his ankle, but otherwise a healthy person.

*Assignment of Error No. 1:*

"Defense counsel for the prevailing party, Michael R. Gallagher, was guilty of misconduct during the course of trial and the trial court erred in failing to stop the improper argument of counsel and in failing to instruct the jury to disregard the improper argument."

This assignment of error is not well taken.

During the course of the trial, defense counsel for Dr. Gale and the Cleveland Anesthesia Group, Inc., cross-examined the appellants' economic expert concerning the effect of taxes on a calculation of Mr. Siegel's probable future earnings. When counsel appeared to do so obliquely, by asking the witness to deduct thirty percent from Mr. Siegel's adjusted gross income from the year 1969, Mr. Dempsey asked to approach the bench. There is no record of the discussion, but thereafter counsel was permitted to continue along the same line of questioning, during which he referred to the thirty percent deduction as reflecting Mr. Siegel's personal consumption. Two objections to this questioning were overruled. A subsequent objection was sustained when defense counsel asked the witness: "Well, let's go over here. We take taxes into account and do the same computation." The court then admonished counsel, asking, "Isn't this what we were talking about?" (referring to the previous side bar discussion).

It is impermissible to ask an economic expert witness on cross-examination to figure income tax deductions into his calculation of a decedent's probable future earnings. *Bergfeld v. N.Y., C. & St. L. Rd. Co.* (1956), 103 Ohio App. 87, 99.

In the present case, however, it is unclear that defense counsel's questions were so designed until he expressly asked for a consideration of income tax. At that point the court prevented further inquiry concerning taxes.

Furthermore, as the jury eventually returned a verdict for defendant on the issue of liability, it never reached the question of damages.

Under these circumstances we find no error prejudicial to the appellants as a result of the defense counsel's conduct.

Appellants also cite the following statements made during closing arguments as incidents of alleged misconduct of defense counsel:

"Now, we have something else. You recall that Mr. Dempsey has referred to it a number of times in his report that Dr. Gale made within an hour after the accident in his own handwriting.

"We attempted to get that into evidence and it was objected to and kept out.

"We identified the anesthesia report which came from

that and that was kept out, and that, I submit to you, would be solid evidence as to what actually transpired during the course of the anesthesia.* * *

"While you are concerned about what the family gets, it is what the family gets after he has taken out for his personal consumption and after you make some judgment as to what his income has been and I submit to you that while I respect Dr. Burke, there was some lack of candor in grabbing a W-2 form and no income tax return for the last year when the W-2 form of the prior year was reduced by some $6,000 and some sort of expenses that were written off and I submit to you that if we could have gotten our hands on the income tax return, that it would have shown something different from what he suggested.

"Mr. Dempsey: Objection.

"The Court: Objection sustained.

"Mr. Gallagher: Well, I suggest to you that Mrs. Gold, who testified here, is married to a lawyer; that the former Mrs. Siegel is married to a lawyer. That he was playing tennis with a lawyer when he ripped his Achilles tendon. That a lawyer took him to the hospital and I sort of suppose that he might be able to get somebody to fix up an income tax return.

"Mr. Dempsey: Objection.

"The Court: Objection is sustained. The jury will disregard that remark.

"Mr. Gallagher: Now, we know where we have some reliable figures, that is, figures that actually went to the Internal Revenue Service. What his gross was, and what he paid in taxes and how this jiggling is done.

"What we don't know, I suppose, is whether this 30 percent is a very valid figure for his personal consumption because it seemed to me that he did a good deal of golfing and tennis playing and skiing in Europe and all around the country. And that we know he liked to do these things, but we are not at all certain how much he liked to work and that could be a very important consideration into what the future held, particularly for the people who he was obligated to support."

Initially, we note that an appellate court is precluded from reversing a case on the alleged ground of misconduct of counsel unless objections were made at trial and an opportunity was thereby afforded for the trial court to prevent any pre-

judicial impact. *Snyder* v. *Stanford* (1968), 15 Ohio St. 2d 31.

Of the arguments quoted above, therefore, the only remarks which we may consider are (1) the one concerning the economic expert's (Dr. Burke's) "lack of candor," and (2) the suggestion that Mr. Siegel could have gotten someone to "fix up an income tax return."

In *Jones* v. *The Macedonia-Northfield Banking Co.* (1937), 132 Ohio St. 341 (syllabus paragraphs 1, 2 and 3), the Supreme Court held:

"1. It is the duty of counsel to refrain from challenging the honor or reputation of a witness, party or opposing counsel unless warranted by the evidence.

"2. Utterances of counsel while evidence is being adduced, whether consisting of comments on the evidence or of offensive and personal remarks, are improper and unethical and, if prejudicial and not waived, constitute reversible error.

"3. Argument to the jury, in which counsel charges opposing parties with framing or fixing up their defense by perjury arranged for or suborned, is improper unless there is evidence warranting the course pursued; and where counsel grossly abuses his privilege by persisting in making such unfounded charges to the manifest prejudice of opposing parties, it is the duty of the court to interfere, admonish offending counsel and instruct the jury to disregard the improper utterances, and a failure to do so is ground for a new trial."

Under the facts of the present case, the defense counsel's remarks concerning Dr. Burke's candor and Mr. Siegel's fixing up a tax return were unwarranted. The court correctly sustained objections to these remarks and instructed the jury to disregard the reference to Mr. Siegel's alleged conduct.

However, although the jury received no additional instruction to disregard the first remark, we do not find these incidents of misconduct so prejudicial as to warrant reversal on this ground.

We must assume that the jury heeded the instruction of the court and that any prejudice due the statement concerning Mr. Siegel was thereby significantly reduced or eliminated. Any prejudicial effect of the remark concerning Dr. Burke was also diminished by the court's sustaining of an objection. Furthermore, Dr. Burke's credibility related only to the issue of damages, which the jury did not reach. Under these facts,

there has been no showing that the misconduct so prejudiced the jury in general that it influenced their finding of no liability. Accordingly, the first assignment of error is overruled.

*Assignment of Error No. 2:*

"The trial court erred in granting a directed verdict in favor of defendant, A. W. Tramer, M.D., when a jury question existed on the issue of the lack of informed consent."

This assignment of error is well taken.

Civil Rule 50(A)(4) provides the standard to be followed in ruling on a motion for a directed verdict:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

The 1970 Official Staff Notes pertaining to Civ. R. 50(A) explain that this rule simply sets forth in rule format the following holding of *Hamden Lodge No. 517* v. *The Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469 (syllabus paragraphs 3 and 4):

"3. Upon motion to direct a verdict the party against whom the motion is made is entitled to have the evidence construed most strongly in his favor. But if upon any essential issue, after giving the evidence such favorable construction, reasonable minds can come to but one conclusion and that conclusion is adverse to such party, the judge should direct a verdict against him.

"4. Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. *The test is not whether the trial judge would set aside a verdict on the weight of the evidence.*" (Emphasis supplied.)

*See The Carter-Jones Lumber Co.* v. *Eblen* (1958), 167 Ohio St. 189; *Quayle* v. *Varga* (1975), 44 Ohio App. 2d 108; *Morgan* v. *Sheppard* (1963), 91 Ohio Law Abs. 579.

The appellants' claim against Dr. Tramer is based on the theory of lack of informed consent. This theory was analyzed by this court in the recent case of *Lowe* v. *Green,* unreported, No. 36342, decided September 22, 1977, as follows:

"The starting point for a discussion of the tort theory of lack of informed consent is the remark of Judge Cardozo in *Schloendorff* v. *Society of N.Y. Hosp.* (1914), 211 N.Y. 125, 105 N.E. 92, 93: 'Every human being of adult years and sound mind has a right to determine what shall be done with his own body.\*\*\*' " *See Congrove* v. *Holmes* (1973), 37 Ohio Misc. 95, 104.

In Ohio, undertaking a surgical procedure on a patient without a valid and effective consent by the patient has been held to constitute a "technical assault and battery," *Lacey* v. *Laird* (1956), 166 Ohio St. 12, or a tort based upon negligence, *Belcher* v. *Carter* (1967), 13 Ohio App. 2d 113.

The patient, who admittedly has not been fully informed of the material consequences of the surgical, medical, or other therapeutic procedures used upon him, has a cause of action against the medical practitioner for medical negligence. This tort of medical negligence is premised on the duty which a medical practitioner owes to his patient to fully inform his patient of the medical procedures which are to be performed on the patient's body. *See Canterbury* v. *Spence* (1972), 464 F. 2d 772, *certiorari denied,* 409 U.S. 1064; *Waltz and Scheuneman, Informed Consent to Therapy,* 64 Nw. U. L. Rev. 628 (1970); and Note, *Informed Consent—A Proposed Standard for Medical Disclosure,* 48 N.Y. U. L. Rev. 548 (1973).

The negligent tort of lack of informed consent is made out when the medical practitioner (1) fails to disclose to the patient the material risks and dangers inherently and potentially involved with respect to the proposed therapy and the alternatives to that therapy, if any; (2) does not discuss the risks and dangers not disclosed by the medical practitioner that are harmful to the patient; (3) when the unrevealed risks and dangers which should have been disclosed by the medical practitioner actually materialize and are the proximate cause of the injury to the patient; and (4) when the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him prior to the therapy. *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127, 136 (dictum); *Congrove* v. *Holmes, supra; Canterbury* v. *Spence, supra; Waltz & Scheuneman, supra;* Note, *Informed Consent, supra.*

As to the fourth element, this court held in *Lowe* v. *Green,*

*supra,* that the question is whether, under the total circumstances of the patient's treatment, a reasonable, prudent patient would have withheld consent had the patient been informed of all the material risks and dangers involved with the medical procedure.

In the present case, the appellee (Dr. Tramer) directs the court's attention to the Special Consent document signed by Mr. Siegel, which states in paragraphs 3 and 6 respectively:

"I have been advised of the risks and the consequences associated with the procedure(s). I have also been advised that there are certain risks associated with the performance of any surgical procedure."

"I hereby consent to, and authorize and request, the administration of anesthesia to be applied by, or under the direction and supervision of a member of the anesthesiology staff."

However, in *Bruni* v. *Tatsumi, supra* at 136-137, the Supreme Court held that even where the patient signed a "written consent without question or equivocation," where the evidence showed that the surgical procedure employed offered a different degree of risk than that which was explained to the patient, the question of whether the patient consented to the procedure that was actually performed was an issue for the jury to decide.

Thus, in this case, although the document is evidence of consent, it is not conclusive, because it leaves open a question for the jury as to whether Mr. Siegel consented to the added degree of risk of which he may not have been adequately informed, namely the special danger involved in administering anesthesia to an asthmatic.

The appellees argue furthermore that a person in Mr. Siegel's position would have consented, even had he been so informed, because he was an active and athletic person. In light of Mr. Siegel's sensitivity to his asthmatic condition, in part reflected in his seeking and obtaining permission to carry his nebulizer into the hospital and the operating room, he may well have decided to wait and see if nature would heal the tendon or fill the ends of the tendon with scar tissue before submitting to an operation. Nor do we rule out the likelihood of his seeking additional professional advice. We hold this to be an issue of fact for the jury.

Construing this evidence in a light most favorable to the appellant, we rule that reasonable minds could differ on the questions of whether Mr. Siegel was adequately informed of the degree of risk to which he, as an asthmatic, would be exposed during surgery, and whether a reasonable, prudent patient in Mr. Siegel's position would have withheld consent if informed of such a risk.

Accordingly, this assignment of error is sustained.

The appellant's third and fourth assignments of error both contest the court's order denying a new trial.

A motion for a new trial is addressed to the sound discretion of the trial court and will not be disturbed on appeal unless the appellant can demonstrate an abuse of discretion. *Yungwirth* v. *McAvoy* (1972), 32 Ohio St. 2d 285; *Rohde* v. *Farmer* (1970), 23 Ohio St. 2d 82.

In support of the contention that the court abused its discretion in denying a new trial as to Dr. Gale and the Cleveland Anesthesia Group, Inc., the appellant refers to Civ. R. 59(A)(6), namely, that the jury's verdict was against the weight of the evidence.

*Assignment of Error No. 3:*

"The trial court erred in denying plaintiff appellant's motion for a new trial on the basis that the judgment was not sustained by the weight of the evidence."

According to defendant Dr. Gale, the patient experienced a bronchospasm and a cardiac arrest simultaneously. Dr. Joachim S. Gravenstein was an expert witness retained on behalf of defendants, Dr. Gale, Dr. Katz and the Cleveland Anesthesia Group. Dr. Gravenstein is the Chief of Anesthesia at University Hospital and also the Chairman of the Department of Anesthesia of Case Western Reserve University Medical School. Based on the record and report of Dr. Gale, that the patient was agitated and that there was no evidence of breathing difficulties or abnormality in the vital signs of the patient at the time pentothal was administered, Dr. Gravenstein concluded that it is not contraindicated to administer pentothal to asthmatics for the purpose of either inducing or maintaining anesthesia for surgery; that the appearance of a regional cyanosis in a patient is not uncommon and does not suggest that a surgical procedure should be interrupted; and that Dr. Gale's method of sedating and treating Siegel was ap-

propriate and consistent with good medical practice. However, when asked whether he would administer pentothal under the circumstances described by Dr. Gale, Dr. Gravenstein went no further than to say that he might.

Dr. David Mendelsohn, Chief of Anesthesia at St. Vincent Charity Hospital, was retained by St. Paul Mercury Insurance Co. (the excess insurer of Dr. Gale and Dr. Katz) to evaluate the case. His deposition was read to the jury as part of Dr. Gale's defense.

Dr. Mendelsohn, characterized by defense counsel as a "witness worthy of belief as the one doctor whose testimony is given without bias or slant," testified that the injection of thiopental into the patient exacerbated the asthmatic attack which lead to bronchospasm. In his opinion, there were two possible precipitating factors, the history of severe asthmatic attacks, precipitated by stress and sodium pentothal (thiopental). When asked if he would use thiopenthal under the conditions and circumstances described by Dr. Gale, Dr. Mendelsohn replied unequivocably that he would not.

Appellant's expert, Dr. John Viljoen, Chairman of the Department of Anesthesiology at the Cleveland Clinic, interpreted the patient's pushing himself up on the operating table as evidence of his breathing difficulty. He testified that this respiratory embarrassment may have been the result of the cumulative effect of the drugs or the beginning stages of a bronchial spasm caused by the patient's apprehension and nervousness. In Dr. Viljoen's opinion, Dr. Gale was negligent in his treatment of the patient because pentothal "was the straw that broke the camel's back" and should not have been administered when the patient is suffering breathing difficulties. Dr. Gale, Dr. Gravenstein, Dr. Mendelsohn and Dr. Viljoen all agree that pentothal should not be used when the patient is undergoing respiratory embarrassment.

In analyzing the facts in this case, there are certain common conclusions that can be drawn:

(1.) That thiopental (a brand name) is also known as sodium pentothal;[3]

(2.) That the use of thiopental in a patient with a history of asthma is within acceptable medical standards (indeed, Dr. Vil-

---

[3] In this discussion they are used interchangeably, depending on the one chosen by the witness.

joen, appellant's expert, is a protagonist of the use of thiopental);

(3.) That the administration of thiopental to an asthmatic patient who is experiencing respiratory embarrassment (breathing difficulties) is contraindicated (not within medical standards);

(4.) That the patient here underwent an asthmatic attack that "bloomed into a bronchospasm";

(5.) That an asthmatic attack coupled with a reflex cardiac arrest is a rare happening, but if it occurs, the bronchial attack would precede the cardiac arrest;

(6.) That the cyanosis occurred immediately after the injection of the thiopental;

(7.) That wheezing accompanies a bronchial attack in an asthmatic;

(8.) That the opinions of the experts, Dr. Viljoen, Dr. Mendelsohn, and Dr. Gravenstein, were based on the records, reports and testimony of defendant, Dr. Gale; and

(9.) That based on the assumption that Dr. Gale's records, reports and testimony were accurate, all three experts agreed that the administration of thiopental was within acceptable medical practices. (However, even if those assumptions were taken as true, Dr. Mendelsohn and Dr. Viljoen testified that they would not have administered thiopental while Dr. Gravenstein testified that he might.)

In this case, the defendant-appellees, Dr. Gale and Cleveland Anesthesia Group, Inc., contend that the deceased had suffered a bronchial spasm almost simultaneously with a reflex cardiac arrest.

In explaining a cardiac arrest, we find the following discussion between Dr. Viljoen (appellant's expert) and counsel (upon direct examination):

"Q. ***What is a reflex arrest?

"A. A reflex arrest is usually due to a sudden discharge of nerves, impulses consequent upon a sudden insult that's inflicted on the body.

"For example, if I were to go up to one of you ladies and gentlemen and push two fingers in your eyeballs, there is a well-known reflex that causes a discharge to the heart and causes it to stop instantly and this can also apply to a patient who has a blow in the upper abdomen or a sudden physical in-

sult or an alternative electric shock can do the same thing.***"

Dr. Viljoen was then called upon to be specific.

"Q. ***Now, from the facts that you have had before you and based on your knowledge and experience in this case, do you believe that there could have been a reflex change or reflex heart attack?

"A. Highly unlikely. Highly unlikely."

And later he testified:

"***I would have to be a really imaginative person to think that those two things could occur almost identically."

We find the substance of the testimony of Dr. Gravenstein (appellees' expert) remarkably similar to the testimony of Dr. Viljoen (appellant's expert). Dr. Gravenstein explained the reflex cardiac arrest in this way (upon cross-examination):

"A. The heart is supplied with two different types of nerves and a strong stimulation coming down to the heart via these nerves, a stimulation triggered by another event in the body is called a reflex and sometimes such reflexes can cause cardiac standstill."

When asked whether a bronchial spasm accompanied by a reflex cardiac arrest was a common occurrence, Dr. Gravenstein answered as follows:

"A. It is unusual to have a cardiac arrest. I know of instances described in the literature where a cardiac arrest and a respiratory arrest were reported to have occurred simultaneously."[4]

"Q. Now, what would initiate such a reflex?

"A. A strong stimulation of these nerves. The stimulus can be a variety, pressure on the eyeballs, for instances, or pressure on the neck. This sort of thing.

"Q. A heavy blow to the chest?

"A. Yes.

"Q. An extremely frightening occurrence?

"A. Yes."

As to whether such stimulation was present in this case, we find the following:

---

[4] When the question was narrowed to his personal experience, Dr. Gravenstein readily admitted that the cardiac arrest in a bronchial spasm came fairly late after a good deal of struggling.

"Q. Do you see any evidence of that in this case?

"A. Of a frightening occurrence?

"Q. Oh, no, of *any* of those that would lead to a reflex—

"A. No. I don't." (Emphasis added.)

Although Dr. Gravenstein testified that a reflex cardiac arrest can occur upon strong stimulation, he readily admitted that he saw none of these stimuli in the case at bar.

Furthermore, Dr. Gravenstein supported his diagnosis of a reflex cardiac arrest in the weakest manner known to the law of evidence, through hearsay testimony, of "instances described in literature." There was no testimony whether that patient was restless; whether an operation was in progress, and, if so, the kind and the part of the body upon which it was performed; which pre-operative drugs were administered; the general health of the patient; and the condition of his heart, or where "in literature" it was so reported or when or by whom. In the absence of authenticated information somewhat comparable to the case at bar, we submit that this aspect of his opinion has little probative value.

As to the remaining part of the diagnosis, all the experts (including the defendant Dr. Gale) agree that an asthmatic attack and bronchospasm occurred. Dr. Gale testified that the signs a doctor can detect prior to a bronchial spasm are wheezing and changes in pulse and blood pressure. Dr. Gale stated he failed to detect them.

However, his expert, Dr. Gravenstein, testified as follows:

"***The signs and symptoms of an asthmatic attack are fairly clearcut so if somebody has an asthmatic attack, it should be fairly obvious.***"

He points out further that a bronchial spasm is part and parcel of an asthmatic attack so one does not precede the other.

The following dialogue between Dr. Gravenstein and appellant's counsel is most revealing. The doctor rephrased the question directed to him:

"***You are asking would you by necessity have wheezing in an asthmatic patient who is having bronchial spasm, asthmatic attack?

"Q. Yes.

"A. And the answer is yes, by necessity you would expect to hear wheezing.

"Q. ***[D]o you mean it should be there in every case?
"A. That's right.***
"A. That's correct. That should be there in every case."

The testimony of the appellant's expert supported the warning signals of a bronchial constriction. Dr. Viljoen, the appellant's expert, testified (upon cross-examination):

"Q. And when one has bronchial constriction, the tubes are slightly constricted and you can tell this, Doctor, can't you?

"You hear the breathing wheezes, is that correct?

"A . Yes.

"Q. And you, as a competent anesthesiologist with the person who was beginning a bronchial constriction, you could hear these breath sounds, couldn't you, if you were paying attention?

"A. If you were listening.

"Q. And you listen with a stethoscope?

"A. Continuously, yes.

"Q. All right. So that Dr. Gale would have heard if there had been a progressive development of bronchial constriction up to the point of full bronchial spasm. He would have heard these breath sounds, wouldn't he?

"A. ***[Y]ou mean if he had a stethoscope connected to the chest throughout the proceeding, yes.***

"Q. I am simply stating these facts to you. You say notwithstanding this testimony by the doctor who was there you disagree with it. You feel there was respiratory embarrassment during that time?

"A. Yes."

Notwithstanding the testimony of these experts and notwithstanding the common diagnosis that a bronchospasm occurred, Dr. Gale persisted in his testimony that he heard no wheezing at any time,[5] nor for that matter recognized the bronchospasm.

---

[5] Indeed his entire reconstruction of the facts was challenged by Dr. Viljoen when he was asked (upon cross-examination):

"Q. Dr. Gale has testified that there was no respiratory embarrassment. Are you saying that based upon what you have read in this record, that is some agitation on the part of this patient, you are saying that his testimony, that he felt the pulse, that he heard proper breath sounds and that he found blood pressure up to the moment these two things occurred is not so?

"A. I would have to say that it is highly unlikely.

Here we have evidence that an asthmatic patient was so sensitive to his affliction that he obtained permission to take his nebulizer with him to the operating room, that he had a history of asthma which Dr. Gravenstein testified made him develop bronchial spasms very easily, that lying on his face, he had the weight of his body pressing his chest on the operating table and thus could not breathe as easily as a patient lying on his back, and that he acted erratically on the table by seeking to lift his chest off the table in a pushup fashion which Dr. Viljoen testified "is what patients do when they have respiratory inadequacy lying on their face." Even Dr. Gravenstein admitted that a doctor would be wary if he saw the symptons Mr. Siegel was exhibiting prior to the injection of the thiopental.

Although all the experts agree that there was an asthmatic attack, which by necessity is accompanied by the patient's emission of wheezings, Dr. Gale persists that he failed to detect any wheezes.

If we accept his statement that he failed to detect any wheezes, the weight of the evidence supports the conclusion that he did not detect what was there to be detected, or that he did not hear what was there to be heard. We believe his failure to recognize these wheezes or diagnose the bronchospasm is explained by his own admission that he never witnessed a bronchospasm before. Dr. Sidney Katz, chief of the Department of Anesthesiology at Mt. Sinai Hospital, and also president of the Cleveland Anesthesia Group (and an associate of Dr. Gale), who was in the hospital on that day as a circulator or "trouble-shooter," and up to the sounding of the alarm was a stranger to the surgery, testified that "the first thing that I noticed was that he (the patient) was in a severe bronchial spasm and I yelled***for the isuprel, because I felt that this could be a lifesavings means." Thus, Dr. Katz diagnosed instantly what Dr. Gale learned only subsequently, "that it was a bronchial spasm." Dr. Gale stated that he "didn't know immediately what it was."

Under this state of evidence, we hold that the verdict for the appellees was against the weight of the evidence.

"The Court of Appeals has the authority and duty to

In other words, you are telling me that a healthy person one minute can be dead the next minute as a result of having an ankle operation. Come on now."

weigh the evidence and to determine whether the findings of the trial court as the trier of the facts were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." *State, ex rel. Squire,* v. *Cleveland* (1948), 150 Ohio St. 303, 345.

We sustain assignment of error No. 3.

*Assignment of Error No. 4:*

"The trial court erred in denying plaintiff-appellant's motion for new trial on the basis that the adverse publicity during the trial had a prejudicial impact on the jury."

The fourth assignment of error raises the question of whether the court abused its discretion in refusing to order a new trial on the ground of jury misconduct, provided for in Civ. R. 59(A)(2). In support of the motion for a new trial, the appellant attached a copy of a front page story which appeared in the Cleveland Plain Dealer on May 29, 1976, bearing the headline, "Huge malpractice boost under study." The article discussed an application filed with the State Department of Insurance seeking a rate increase in medical malpractice premiums. The article also discussed the effect of any increase on the cost of medical care to consumers. The appellant submitted no other information to the court, to support her claim that any juror read this article or was improperly influenced by it during deliberations.

"The orderly and prompt administration of justice is not served when motions for new trials are granted upon inconsequential or insubstantial basis." *Steiner* v. *Custer* (1940), 137 Ohio St. 448, 451.

Under these circumstances, the appellants failed to prove a basis for granting their motion. Therefore, the fourth assignment of error must be overruled.

*Judgment reversed and*
*cause remanded.*

PARRINO, P. J., and PATTON, J., concur.