CERVELLI ET AL., APPELLANTS, *v.* KLEINMAN, APPELLEE.

(No. 44476—Decided January 27, 1983.)

*Mr. Richard J. Marco,* for appellants.
*Mr. Robert Ċ. Buck, Jr.,* for appellee.

PRYATEL, C.J. This appeal is taken by plaintiffs-appellants, Frank and Annette Cervelli, from an unfavorable finding in their medical malpractice suit filed against defendant-appellee, Dr. Gary D. Kleinman, a practicing physician with offices in Maple Heights, Ohio.

In their complaint, plaintiffs alleged that on October 8, 1979, Frank Cervelli ("plaintiff"), upon defendant's instructions, had fasted for twelve hours before coming to defendant's office for a physical exam. He was left unattended as a result of which he sustained a fall from the examination table when he lost consciousness, and broke one of his vertebrae. The complaint attributed the damage from this fall to "the negligence of defendant in leaving plaintiff unattended when he (defendant) knew of plaintiff's age (68), physical condition and complaints" and to defendant's failure "to diagnose and treat the injuries received * * *." Plaintiff's wife, Annette, also made a claim for loss of her husband's services during the period when he was disabled from the injury attributed to his fall.

In his answer, defendant admitted that plaintiff came to his office for treatment and that this office call was after plaintiff's wife "had earlier informed defendant's office that plaintiff had become ill and was suffering from nausea and diarrhea." However, defendant denied any negligence in his conduct toward plaintiff.

The case was referred to arbitration. The arbitrators (with one dissent) found for plaintiffs in the amount of $15,000 for Frank and $1,500 for Annette.

Defendant appealed this award to the court of common pleas where a trial *de novo* was held to the court. The court found in favor of defendant on August 25, 1981.

At trial the following evidence was presented:

Annette Cervelli testified that on October 8, 1979, Frank had an appointment

for a complete physical with defendant. Frank was told to fast from 10:00 p.m. on October 7 to 1:30 p.m. on October 8 (the time of his appointment), and to take Glucola around noontime. After Frank took the Glucola at home at 11:45 a.m., the following occurred:

"A.  Well, it was around noontime and he got very nauseous and he got diarrhea * * *.

"* * *

"Q.  What did you do then?

"A.  I got on the phone and talked to the girl, and told her my husband got deathly sick from this Glucola."

(On cross-examination, Annette testified that the doctor's office asked her if she wanted to use her husband's appointment for her own physical — scheduled for a few days later — but that she declined because "he was sick" and she wanted to bring him in that day as originally scheduled.)

While in the outside waiting room, Annette learned that her husband who was left unattended, "had fallen on the floor." Later that day, Frank, who had been complaining of pain in his neck, blacked out at the dinner table. He was admitted to Marymount Hospital, where he remained five or six days. The diagnosis was a broken vertebra.

Frank Cervelli testified that he suffers from aplastic anemia, and that he and Annette became patients of defendant's shortly before the incident in question. Following Frank's illness after taking the Glucola under defendant's instructions, which was reported to defendant's office by his wife, he arrived for his appointment. Defendant's medical assistant, Christine Malone, "came out" to call him into the examining room. Frank testified that:

"A.  She took me in a room there and she said, I want to weigh you.

"Q.  Then what happened?

"A.  I was kind of woozy, I can't remember everything.

"Q.  Tell the Court in your own words exactly what happened while you were with the young lady.

"A.  I think she weighed me, then she said, I got to take your lung test or some kind of a test. She told me to blow into something. Every time I blowed [sic], I was getting dizzy. So I tried about three times and I told her, I can't do anything, I am too dizzy.

"Q.  You informed her that you were dizzy, you did tell her that you were dizzy?

"A.  Yes.

"Q.  Were you able to successfully complete that test?

"A.  I don't know. I blow [sic] in three times and whether I completed it or not, I don't know.

"* * *

"Q.  Okay. What is the next thing that you remember?

"A.  The only thing I remember, next thing is when she set [sic] me up, set me up [on the examining table] and says, well, I am finished with you and I am going to get Dr. Kleinman. * * *

"* * *

"Q.  What is the next thing you remember?

"A.  The next thing I remember, when I opened my eyes up, I am laying [sic] on the floor there and I see six pairs of legs around me. That's all I remember."

Called by plaintiffs as on cross-examination, Dr. Kleinman acknowledged the records of his office submitted into evidence. He had prescribed the Glucola as a test for diabetes. He stated that nausea and vomiting are an "accepted" reaction to Glucola in patients with hyperglycemia, although "quite rare." He also admitted the "increased incident" of syncope (fainting) in patients who are older, who have been fasting for twelve or thirteen hours, and who have ingested Glucola and reported nausea and diarrhea.

Finally, plaintiffs submitted the deposition of an expert witness, Dr. Thompson on the faculty of University

Hospitals of Case Western Reserve University and Director of Clinical Pharmacology, who in response to the hypothetical question posed by plaintiffs' counsel, stated as follows:

"Again, Doctor, then assuming the facts stated in the foregoing question to be true and in your response have you an opinion based on reasonable certainty from a medical standpoint or from a medical point of view as to whether or not the course of conduct pursued by the physician in this case was such a course that would be followed by a skillful and careful physician engaged in the practice of medicine in this community, that is the Cleveland, Ohio area in October of '79?

"MR. CLEARY:  Objection.

"A.  I have an opinion.

"Q.  What is that opinion, Doctor?

"MR. CLEARY:  Show a continuing objection.

"A.  The opinion is: That it was not a course of medical care that was appropriate."

For the defense, Christine Malone, defendant's medical assistant, testified that she examined and tested the patient and took a lengthy history from him, and that he displayed no unusual symptoms, nor did he make any complaint of dizziness to her.

After completing the preliminary tests, Malone testified that she left the room while Frank was on the examining table. No more that "3 or 4" minutes later, the doctor came in and found Frank on the floor. Dr. Kleinman resumed the stand for the defense, denying any negligence in leaving plaintiff alone on the examining table when the fall and resulting injury occurred.

On appeal, plaintiffs assign two errors. * * *■

Assignment of Error No. II

"The trial court erred in rendering a decision that is against the manifest weight of the evidence."

Under this assignment of error, appellants argue that the judgment below is against the manifest weight of the evidence. We agree.

In medical malpractice cases, the plaintiff must prove his case by the preponderance of the evidence, in accord with the following principle in *Bruni* v. *Tatsumi* (1967), 46 Ohio St. 2d 127, at 131 [75 O.O.2d 184]:

"Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things. *Ault* v. *Hall* (1928), 119 Ohio St. 422; *Amstutz* v. *King* (1921), 103 Ohio St. 674; *Bowers* v. *Santee* (1919), 99 Ohio St. 361; *Hier* v. *Sites* (1914), 91 Ohio St. 127, 130; *Gillette* v. *Tucker* (1902), 67 Ohio St. 106; *Pollack* v. *Dussourd* (C.A. 6, 1947), 158 F. 2d 969.

"Failure to establish the recognized standards of the medical community has been fatal to the presentation of a prima facie case of malpractice by the plaintiffs. See annotations, 141 A. L. R. 5 and 81 A. L. R. 2d 597."

In such case, plaintiff has the burden of establishing the degree of care owing him by the hospital. See *Johnson* v. *Grant Hospital* (1972), 32 Ohio St. 2d 169 [61

O.O.2d 413]; *Burks* v. *Christ Hospital* (1969), 19 Ohio St. 2d 128 [48 O.O.2d 117].

In the instant case, the court made the following findings in support of its conclusion that the risk of injury to plaintiff was not "foreseeable" when he fell from the examining table in the doctor's office:

"The court finds that there has been no medical malpractice committed by the defendant. The standard of care imposed upon a medical doctor has been enunciated in *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127 [75 O.O.2d 184]. The court stated that:

" 'In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care or diligence would not have done under like or similar conditions or circumstances' * * *

"First, on the day of the accident the defendant had not physically treated the plaintiff before his fall.

"Second, although the defendant requested that the plaintiff fast before his exam, the court does not believe that this falls below the standard of ordinary medical care. Fasting prior to a physical exam, followed by a glucose tolerance test is an appropriate procedure to determine whether a patient has aplastic anemia. Therefore, defendant's pre-examination directions comply with ordinary medical practice.

"Further, the court has considered the doctrine of respondeat superior and finds the defendant's assistant exercised ordinary care in her treatment of the plaintiff. There being no negligence on the part of the assistant, none can be imputed to her employer.

"The court bases its conclusion upon a finding that the plaintiff was not an at risk patient when he was left unattended in the operatory. Defendant's employee, an experienced medical assistant, testi-fied that there was nothing unusual about the plaintiff's condition. Further, she testified that the plaintiff never complained of nor exhibited a condition of dizziness.

"The court does not believe from the facts presented to it that it was forseeable [*sic*] that the plaintiff was at risk of falling from the table."

We find that the evidence in this case does not support the court's findings as to (1) lack of knowledge of appellee as to appellant Frank's weakened condition, and (2) the lack of foreseeability of appellant being "at risk" in falling from the table.

The doctrine of *respondeat superior* applies to the master-servant (employer-employee) relationship, and to the superior's control over and responsibility for the acts of his subordinates for the safety of others. *Councell* v. *Douglas* (1955), 163 Ohio St. 292 [56 O.O. 262]. Thus, the employer will be held liable for injuries resulting from the conduct of his employees, acting within the scope of their employment.

In the instant case, appellee himself admitted that he was informed of Frank's violent reactions (diarrhea and nausea) upon taking the Glucola an hour before Frank appeared for his scheduled appointment, through the phone call the patient's wife made to appellee. Frank's hospital record signed by Dr. Kleinman includes the following comments:

"Approximately one hour prior to [his] appointment, the patient's wife called, stating that he [Frank] had become ill. After being notified, I instructed our office to call the family and reschedule his appointment for later the same week. His wife insisted, however, that his appointment not be changed."

Therefore, Dr. Kleinman was chargeable with this knowledge even if the testimony of his assistant is credited that the patient Frank did not (as Frank testified he did) complain personally to her of any dizziness before she left him unattended on the examining table. Even if ap-

pellant had not so testified, he had a right to expect that his doctor, the appellee, who had talked to plaintiff's wife, would have taken the proper precautions.

It is also undisputed both in the testimony of plaintiffs' expert witness, Dr. Thompson, and in defendant's own testimony that a risk of syncope (fainting) is associated with a patient in Frank's condition while at defendant's office.

Dr. Thompson was asked on redirect and recross:

"Q. Just one or two questions, Dr. Thompson. Let's assume that there was no report of dizziness and that the only factors to be considered would be a 68 year old white male who had fasted for in excess of 13 hours who had reported the onset of illness, diarrhea, nausea and vomiting, can you express an opinion to a reasonable medical certainty that such an individual is at risk as far as the potential of a syncope?

"* * *

"A. Yes, I have an opinion.

"Q. What is that opinion?

"A. That that person is at increased risk of having a syncopal episode.

"* * *

"Q. *Does reasonable practice of medicine then require that certain safeguards be taken when there is an increased risk?*

"A. *Yes, as I already stated.*"[2] (Emphasis added.)

Similarly, defendant himself testified on the potential risk of such a patient as follows:

"Q. Is there an increasing incident of passing out of older persons?

"A. In general?

"Q. Yes..

"A. The older someone gets, the more likely they are to.

"Q. Is there an increasing incident of a syncope who has fasted for 12 or 13 hours?

"A. Yes.

"Q. Is there a [*sic*] increasing incident in syncope or passing out?

"* * *

"A. Yes.

"Q. Thank you. In one who has ingested Glucola?

"A. Yes.

"Q. If one who has reported to you that they have suffered from nausea, vomiting and diarrhea after ingesting Glucola, is there also a [*sic*] increased risk of syncope?

"A. Yes.

"Q. And if one has all of these factors are present, is there again a [*sic*] increased risk of syncope?

"A. All of which factors?

"Q. The factors we discussed.

"A. Yes."

Again, on redirect, appellee, Dr. Kleinman was asked:

"* * *

"Q. * * * Is there an increased risk of a [*sic*] ontoward event when someone has ingested Glucola after a [*sic*] extended fast?

"A. Yes, but I would like to again clarify that.

"Q. The answer to the question is yes, is that true?

"A. Yes, yes.

"* * *

"Q. Is there increased risk of a [*sic*] ontoward event in someone who has become ill with nausea, diarrhea and vomiting, after ingesting Glucola?

"A. Yes.

"Q. Diarrhea takes fluids from the stomach, does it not?

"A. Yes, it does.

---

[2] Earlier in his testimony, responding to the hypothetical question assuming the facts to be identical to those involved in this case, Dr. Thompson had stated his opinion that "[the course of conduct pursued by the physician in this case] was not a course of medical care that was appropriate."

"Q. And this causes the blood flow to go to the stomach and away from the head, is that correct?

"A. Perhaps, not quite right, but close.

"Q. But there is then a [sic] increased risk of a fainting or a syncope?

"A. Correct.

"Q. Is that true?

"A. Yes."

In *Siegel* v. *Mt. Sinai Hospital* (1978), 62 Ohio App. 2d 12 [16 O.O.3d 54], also a malpractice suit, this court held that the trial court's verdict was against the manifest weight of the evidence, reasoning at pages 29-30 as follows:

"Although all the experts agree that there was an asthmatic attack, which by necessity is accompanied by the patient's emission of wheezings, Dr. Gale persists that he failed to detect any wheezes.

"If we accept his statement that he failed to detect any wheezes, the weight of the evidence supports the conclusions that he did not detect what was there to be detected, or that he did not hear what was there to be heard. We believe his failure to recognize these wheezes or diagnose the bronchospasm is explained by his own admission that he never witnessed a bronchospasm before. Dr. Sidney Katz, chief of the Department of Anesthesiology at Mt. Sinai Hospital, and also president of the Cleveland Anesthesia Group (and an associate of Dr. Gale), who was in the hospital on that day as a circulator or 'trouble-shooter,' and up to the sounding of the alarm was a stranger to the surgery, testified that 'the first thing that I noticed was that he (the patient) was in a severe bronchial spasm and I yelled * * * for the isuprel, because I felt that this could be a lifesavings means.' Thus, Dr. Katz diagnosed instantly what Dr. Gale learned only subsequently, 'that it was a bronchial spasm.' Dr. Gale stated that he 'didn't know immediately what it was.'

"Under this state of evidence, we hold that the verdict for the appellees was against the weight of the evidence.

" 'The Court of Appeals has the authority and duty to weigh the evidence and to determine whether the findings of the trial court as the trier of the facts were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial.' *State, ex rel. Squire,* v. *Cleveland* (1948), 150 Ohio St. 303, 345 [38 O.O. 161]."

In light of Dr. Kleinman's own admissions that a patient who exhibited the symptoms (nausea and diarrhea) of which Frank complained after taking Glucola was at an "increased risk" of fainting, and the uncontroverted corroborating testimony of Dr. Thompson (the only expert witness), the court's finding that it was *not* "foreseeable" that Frank "was at risk of falling from the table" is contrary to the evidence on the record.

Instead, the evidence clearly shows that there was an increased risk and that the risk was foreseeable since defendant admitted that he, personally, was informed of plaintiff's condition an hour before plaintiff's wife brought him in for his appointment.

Appellants' Assignment of Error No. II is well-taken.

The judgment below not being supported by the evidence, we reverse and remand for a new trial. See *Siegel, supra.*

*Judgment reversed and cause remanded.*

CORRIGAN, J., concurs.

CELEBREZZE, J., not participating.