**DESGRAVISE et al., Appellees,**

v.

**ST. VINCENT CHARITY HOSPITAL et al; Steffee, Appellant.**

[Cite as *Desgravise v. St. Vincent Charity Hosp.* (1989), 64 Ohio App.3d 91.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 55822.

Decided Sept. 11, 1989.

*David C. Engle,* for appellees.

*Thomas H. Terry* and *Robert C. Seibel,* for appellant.

FRANCIS E. SWEENEY, Judge.

Plaintiffs-appellees Norma J. Desgravise ("Mrs. Desgravise") and her husband, Joseph Desgravise ("Mr. Desgravise"), received a jury verdict in the amount of $32,000 plus interest and costs against defendant-appellant Arthur Steffee, Jr., M.D. ("Dr. Steffee"). Dr. Steffee appeals the trial court's denial of his motions for a directed verdict. For the reasons adduced below, we affirm.

The record indicates that Mrs. Desgravise had suffered from rheumatoid arthritis in her hands, shoulder, neck and feet for twenty-five to thirty years. The disease, which destroys the cartilage of the joints causing the surrounding muscles to contract, was moderately painful to Mrs. Desgravise. She was able to keep the pain to a tolerable level by ingesting twelve analgesic

Ascriptin tablets a day. She has been taking this medication since 1973. She functioned reasonably well in her duties as a housewife despite her condition.

Sometime in late 1983, Mrs. Desgravise, then fifty-one years old, was given the name of Dr. Steffee as a doctor who might be able to treat her condition.

Dr. Steffee examined Mrs. Desgravise on January 5, 1984 and diagnosed rheumatoid arthritis. Dr. Steffee recommended that replacement arthroplasty be performed on the metacarpal phalangeal joints of her right hand. This procedure would surgically replace the joints, commonly known as knuckles, with prosthetic joints.

Statements made by the parties at the first office visit are conflicting. The appellees stated that Dr. Steffee said he could fix the hand. They also testified that Dr. Steffee had said the operation would be simple and that Mrs. Desgravise would have eighty percent of the use of the hand. They also stated that Dr. Steffee did not explain the risks or potential complications of the procedure with them. They were aware that a particular result could not be guaranteed. Mrs. Desgravise testified that Dr. Steffee answered all questions posed to him by the appellees. Dr. Steffee also stated that he felt that he explained the material risks of the procedure. Mrs. Desgravise decided to have the operation.

On February 14, 1984, at 2:30 p.m., Mrs. Desgravise was admitted to St. Vincent Charity Hospital in Cleveland, Ohio. Following preliminary surgical preparations, Mrs. Desgravise was given a preprinted consent form at approximately 10:00 p.m., which she then read and signed. This form was not reviewed with Mrs. Desgravise by anyone.

On the morning of February 15, 1984, the day of the surgery, Dr. Steffee spoke very briefly with Mrs. Desgravise during his morning rounds. The purpose of the meeting was to see if the patient was ready for surgery. The contents of the consent form were not discussed at this time.

Following surgery, Mrs. Desgravise underwent the prescribed course of physical therapy. In May 1984, it became apparent to the parties that the hand was not responding to treatment as expected. The hand exhibited excessive swelling and scar tissue, and the tendon of the middle finger had begun to slide down the side of the new knuckle. This resulted in the patient being unable to extend the middle finger on her own, thereby detrimentally affecting the use of the remaining fingers. The hand became practically useless.

In July 1984, Dr. Steffee discussed with the appellees the need for a subsequent surgery to "fine tune" the work of the previous operation. Mrs. Desgravise was told to come back to Dr. Steffee's office when she had made a

decision on the second surgery, but not to let it wait until the fall. Mrs. Desgravise never went back to Dr. Steffee, but instead sought a second opinion from Dr. Heiple on January 3, 1985. Dr. Heiple indicated that there was not much chance for improving the condition of the hand through a second surgery. Based on that opinion, Mrs. Desgravise decided not to elect the second procedure.

On May 21, 1985, the appellees filed their complaint with a jury demand, alleging negligent treatment by Dr. Steffee in Count Two.[1] Dr. Steffee's motion for summary judgment, filed on March 14, 1988, was denied on April 2, 1988. Trial began on April 26, 1988.

Drs. Peacock and Heiple, testifying as medical experts for the appellees, stated that failure to disclose the possibility of a decrease in hand function violated informed consent and that the decrease in function of the hand was proximately caused by the procedure. Appellant moved for a directed verdict at the close of appellees' opening statement, at the close of appellees' evidence, and at the close of evidence. These motions were denied.

On May 25, 1988, the jury returned its verdict in favor of the appellees and against the appellant.

This appeal, raising one assignment of error, followed.

"THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S [*sic*] MOTIONS FOR A DIRECTED VERDICT."

The standard of review relating to a motion for directed verdict was recently enunciated by this Court in *Skerya v. Ford Motor Co.* (Dec. 22, 1988), Cuyahoga App. No. 54897, unreported, at 4–5, 1988 WL 141130:

"Motions for directed verdict are governed by Civ.R. 50(A), which provides in pertinent part:

" '(4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.'

"With regard to the proper test to be applied by trial courts in ruling on motions for directed verdict under Civ.R. 50, the Ohio Supreme Court, in *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68 [23 O.O.3d 115, 116, 430 N.E.2d 935, 937], stated:

---

1. The remaining parties were voluntarily dismissed from the case.

" 'When a motion for a directed verdict is entered, what is being tested is a question of law: that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences form [*sic*] that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove. The "reasonable minds" test of Civ.R. 50(A)(4) calls upon the court only to determine wither [*sic*] there exists any evidence of substantial probative value in support of that party's claim. See *Hamden Lodge v. Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469 [189 N.E. 246].'

"This court has more recently confirmed this standard in *Case Western Reserve University v. Turner Construction Co.* (Oct. 8, 1987), Cuyahoga App. No. 52753, unreported, wherein we stated:

" 'It is the duty of the trial court to submit an issue to the jury where there is sufficient evidence, if believed, to allow reasonable minds to reach different conclusions. *O'Day v. Webb* (1972), 29 Ohio St.2d 215 [58 O.O.2d 424, 280 N.E.2d 896]. The evidence submitted must be given an interpretation most favorable to the opposing party, including both the direct evidence and any reasonable inferences which may be drawn from it. *Rinehart v. Toledo Blade Co.* (1985), 21 Ohio App.3d 274 [21 OBR 345, 487 N.E.2d 920].' "

In the instant case, the appellees rely on a cause of action based upon the tort of lack of informed consent. The elements of this tort were stated by the Supreme Court in *Nickell v. Gonzales* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, syllabus, as follows:

"The tort of lack of informed consent is established when:

"(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

"(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

"(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."

Dr. Steffee stated that he informed Mrs. Desgravise of the material risks involved, namely (1) that the procedure would not cure the rheumatoid arthritis present in the patient, and (2) that a patient's compliance with post-

surgical therapy is critical to the success of the procedure. Dr. Steffee only believed that he had discussed the possibility of subsequent surgical fine-tuning to correct loss of function of the hand with Mrs. Desgravise. The appellees' stated that the potential for subsequent surgery, build-up of scar tissue, and a decrease in function of the hand were not discussed with them. For the purposes of a motion for directed verdict, the appellees' testimony must be accepted.

Notwithstanding this testimony, this assignment requires a review of the consent form signed by Mrs. Desgravise, which reads in pertinent part:

"3. I have been advised of the risks and possible complications associated with the procedure(s). I have also been advised that there are certain risks associated with the performance of any surgical procedure.

"4. I acknowledge that no guarantees have been made to me concerning the results of the procedure(s) described above."

Appellant believes that Mrs. Desgravise was informed of potential risks by the language of Item 3 in the consent form. The record is clear that Mrs. Desgravise did not ask Dr. Steffee what the risks of the procedure were prior to the surgery or to explain what was encompassed by the terms "risks" and "possible complications" contained in the consent form. The appellees trusted Dr. Steffee. Appellant argues that her failure to inquire as to the nature of the risks and complications after having been made aware of their general existence via the consent form acts as a bar to relief. See *Rhodes v. Doctors Hosp. North* (App.1980), 18 O.O.3d 391. We decline to adopt appellant's argument.

■ This court had cause to review a case similar to the present case. In *Siegel v. Mt. Sinai Hosp.* (1978), 62 Ohio App.2d 12, 16 O.O.3d 54, 403 N.E.2d 202, the issue was whether the plaintiff gave informed consent to the performed surgery, thereby mandating a directed verdict for defendant. As in this case, the patient in *Siegel* signed, without questioning, a consent form which stated in general that he had been advised of the procedure's risks and consequences and that there are risks with any surgical procedure. Further, the patient consented to anesthesia to be supplied by the hospital staff. With regard to the consent form, we stated:

"However, in *Bruni v. Tatsumi, supra* [46 Ohio St.2d 127], at 136–137 [75 O.O.2d 184, 190, 346 N.E.2d 673, 680], the Supreme Court held that even where the patient signed a 'written consent without question or equivocation,' where the evidence showed that the surgical procedure employed offered a different degree of risk than that which was explained to the patient, the

question of whether the patient consented to the procedure that was actually performed was an issue for the jury to decide.

"Thus, in this case, *although the document is evidence of consent, it is not conclusive, because it leaves open a question for the jury as to whether Mr. Siegel consented to the added degree of risk of which he may not have been adequately informed,* namely the special danger involved in administering anesthesia to an asthmatic." (Emphasis added). *Siegel, supra,* 62 Ohio App.2d at 22, 16 O.O.3d at 61, 403 N.E.2d at 209. See, also, *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 136–137, 75 O.O.2d 184, 190, 346 N.E.2d 673, 680.

Construing the evidence in a light most favorable to the appellees, we find that reasonable minds could differ on whether Mrs. Degravise was adequately informed of the material risk of subsequent surgery and the potential of a decrease in hand function.

■ Turning to element (b) of the *Nickell* standard, the record reveals that Dr. Steffee and the two medical experts for the appellees, Drs. Peacock and Heiple, testified as to the risks of the procedure. Further, testimony is consistent that a risk of the surgery, namely the tendon slippage in the middle finger, did materialize and was the cause of the marked decrease in function of the hand. Thus, the court was correct in denying a directed verdict on this element of the standard.

■ This brings us to the final element of the *Nickell* standard, paragraph (c). Mrs. Desgravise testified that had she known prior to the surgery of all the material risks which did manifest themselves, she would not have proceeded with the surgery. This statement is not conclusive. It is undisputed that she knew there were "risks" prior to the surgery. It is disputed what the nature of the "risks" disclosed were upon which she based her knowledge. The only two "risks" which Dr. Steffee clearly recalls disclosing were that (1) the procedure would not cure the arthritis and (2) the imperative for compliance with post-surgical therapy. Viewed objectively, it was properly a jury question whether a reasonable person in Mrs. Desgravise's circumstances would have decided against the procedure had that person been properly informed of the attendant risks.

Accordingly, this assignment of error is overruled.

*Judgment affirmed.*

STILLMAN and MITROVICH, JJ., concur.

SAUL G. STILLMAN, J., retired, of the Eighth Appellate District, sitting by assignment.

Paul H. Mitrovich, J., of the Court of Common Pleas of Lake County, sitting by assignment.