NICKELL ET AL., APPELLANTS, *v.* GONZALEZ, APPELLEE.

[Cite as Nickell *v.* Gonzalez (1985), 17 Ohio St. 3d 136.]

(No. 84-650—Decided May 22, 1985.)

*Marlene P. Manes* and *Gary L. Gardner,* for appellants.

*Rendigs, Fry, Kiely & Dennis, John W. Hust* and *D. Marc Routt,* for appellee.

LOCHER, J. The issue before us is whether the judgment notwithstanding the verdict ("j.n.o.v.") was properly granted by the trial court judge in favor of the plaintiffs. For the reasons set forth below we find that the j.n.o.v. was erroneously granted and affirm the decision of the court of appeals.

The standard for granting a motion for j.n.o.v. is the same as that necessary to sustain a motion for a directed verdict. *Agers* v. *Woodard* (1957), 166 Ohio St. 138 [1 O.O.2d 377], at paragraph one of the syllabus. As we set forth in *Posin* v. *A.B.C. Motor Court Hotel* (1976), 45 Ohio St. 2d 271, 275 [74 O.O.2d 427]:

"'* * * The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions."

At trial, Dr. Gonzalez categorically denied responsibility for the injury and that he misinformed or failed to disclose material information to Mrs. Nickell. On cross-examination, Dr. Gonzalez stated:

"Well, there are just three [complications] that we usually discuss with patients undergoing this type of operation. And these are, No. 1, * * * working close to the lung. At some time in the operation, one is only two millimeters or so away from the lung. If one in the process of this operation removes a rib, there can be a little opening into the chest. This is

called pneumothorax. The lung will collapse slightly. This is recognized easily by any trained surgeon and treated easily. The results are good. There is nothing serious about this.

"No. 2, there are blood vessels, which I've already spoken of. There are branches of these blood vessels. One can get in some bleeding in this area. The area is filled with blood vessels, so bleeding is a second complication. Again, a trained surgeon who is doing this kind of surgery all the time is not bothered very much by this. We can handle this and we expect it.

"The third complication is, again, structures that are in the area. They are the lower cords of the brachial plexus. There is a nerve that goes to the arm, the intercostobrachial nerve that sometimes, in the course of the operation, one has to retract, one has to work around. And in the *low, low percentage* of cases, one may get a *temporary nerve palsy,* a palsy being a weakness of the nerve. These are *considered temporary* in most instances." (Emphasis added.)

The record is thus specific as to what was disclosed to Mrs. Nickell in warning her of the normal dangers of the operation. The problem of a permanent brachial nerve palsy, which was suffered by Mrs. Nickell, was unrebutted as being an extraordinarily unusual occurrence; even a temporary palsy was considered rare. The stretch of the brachial plexus which Dr. Gonzalez alluded to with respect to the retraction of the intercostobrachial nerve only involved those areas where the procedure was being performed. No medical testimony or evidence was adduced to suggest that such retraction would or could create a permanent brachial plexus palsy. Even if, *arguendo,* such evidence had been presented, the presence of contrary evidence would have to be given full weight because of the standard for granting a j.n.o.v.

During cross-examination, Dr. Kleinert, plaintiffs' expert witness, was quoted Dr. Gonzalez' testimony concerning the disclosure of the operation's risks to Mrs. Nickell. When asked, "* * * do you have an opinion as to whether or not that explanation that I have quoted by a physician, a surgeon, to a patient with this problem, whether that would fall within that reasonable degree of explanation expected in your profession to be given to a patient?" Dr. Kleinert responded: "Very well. That's probably better than the explanation we give our patients." While local medical custom is not the standard in establishing informed consent, this testimony certainly affirms that brachial plexus palsy was not considered a normal danger of this operation.

Although heretofore this court has not explicitly promulgated the rules for informed consent in a syllabus (cf. *Bruni* v. *Tatsumi* [1976], 46 Ohio St. 2d 127 [75 O.O.2d 184] [dictum at 136]), the appropriate test has been established in Ohio. See *Siegal* v. *Mt. Sinai Hospital* (1978), 62 Ohio App. 2d 12 [16 O.O.3d 54]; *Congrove* v. *Holmes* (1973), 37 Ohio Misc. 95 [66

O.O.2d 295]; *Saxe* v. *United States* (D. Ohio 1983), 577 F. Supp. 135. The tort of lack of informed consent is established when:

(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.

One of the great dilemmas in applying this test is the question of how far a doctor must go in establishing whether a potential danger, albeit improbably remote, is sufficiently material to require disclosure. To this end the reasonable patient standard is utilized. See Note, Informed Consent — A Proposed Standard for Medical Disclosure (1973), 48 N.Y.U.L. Rev. 548, 552-555. See, also, Prosser & Keeton, Torts (5 Ed. 1984) 189-192. In the instant case the jury was properly instructed that "* * * a risk is material when a reasonable person, in what the physician knows or should know to be the patient's condition, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment."

Thus the issue to be ascertained is whether the j.n.o.v. was appropriate in view of the entire record and whether there was a basis for the jury, under the reasonable-person standard, to reach its conclusion in favor of appellee. The patient's hindsight (*i.e.,* testimony as to her hypothetical response to the undisclosed information), while relevant, is not determinative. See *Sard* v. *Hardy* (1977), 281 Md. 432, 450, 379 A. 2d 1014, 1025.

Although evidence was adduced that the danger of a brachial plexus palsy was not disclosed, evidence was also adduced to show such a condition was not normally associated with the operation undergone by Mrs. Nickell. Reasonable minds might very well differ as to whether disclosure of an extraordinarily improbable risk would dissuade a reasonable person from engaging in what testimony showed to be a routine and not abnormally dangerous procedure. Moreover, there is also some question as to whether the procedure even caused the brachial plexus palsy. Certainly, Dr. Gonzalez, contrary to appellants' protestations, never admitted such proximate causation and Dr. Kleinert never directly stated that any action or inaction by Dr. Gonzalez caused the palsy. Accordingly, we cannot say that construing the evidence most favorably in favor of Dr. Gonzalez and most strongly against appellants that the evidence justified a j.n.o.v.

Because we find that the j.n.o.v. was erroneously granted, therefore constituting an abuse of discretion by the trial court, any issues relating to

the propriety of the second trial held to ascertain damages are moot. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

CELEBREZZE, C.J., SWEENEY, HOLMES, C. BROWN, DOUGLAS and WRIGHT, JJ., concur.