BEDEL, Admr., Appellant,

v.

UNIVERSITY OF CINCINNATI HOSPITAL, Appellee.

[Cite as *Bedel v. Univ. of Cincinnati Hosp.* (1995), 107 Ohio App.3d 420.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95AP102–210.

Decided Nov. 16, 1995.

*Condit & Dressing Co., L.P.A., James J. Condit* and *Kevin P. Roberts,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Marilena Walters,* Assistant Attorney General, for appellee.

BOWMAN, Presiding Judge.

During the regular course of her prenatal care, Jacqueline Potts's physician at Christ Hospital ran an alpha-fetoprotein test, the result of which was abnormal. Because of this test result, Potts's physician referred her to the University of Cincinnati Holmes Hospital for an amniocentesis. On July 1, 1987, Potts went for the test and was greeted by Dr. Randall T. Kelly, a perinatologist certified in obstetrics and gynecology and maternal fetal medicine, Dr. Tony Bazi, a third-year resident in obstetrics and gynecology, and Deni Schultz, an ultrasonographer. After introductions, the risks of the procedures, including infection, bleeding, possibility of miscarriage and leakage of fluid, were discussed with Potts. Potts then was given three consent forms titled Informed Consent for Diagnostic Amniocentesis,[1] Informed Consent for Transabdominal Amniocentesis Chromosomal Analysis,[2] and Informed Consent for Transabdominal Amniocentes-

---

1. "INFORMED CONSENT FOR DIAGNOSTIC AMNIOCENTESIS

 "I Jacqueline Potts, agree to permit Kelly M.D. to perform an amniocentesis, a procedure in which approximately 30 c.c. (an ounce) of amniotic fluid is withdrawn through a needle passed into the uterus through the abdominal wall. The amniotic fluid sample will be used in a series of tests that will provide needed information on the condition and the maturity of the fetus. Although extreme care will be taken to avoid any complications from this procedure, there is a remote chance that it will trigger premature labor, cause damage or infection to the fetus or placenta, or cause damage or infection of maternal tissues. The risk of injury to the fetus is less that 0.5%. I understand that it is the opinion of the physician that the hazards of not performing the amniocentesis to obtain the needed information clearly outweigh[ ] any potential complications."

2. "INFORMED CONSENT FOR TRANSABDOMINAL AMNIOCENTESIS CHROMOSOMAL ANALYSIS

is Neural Tube Defects.[3] Each of the three consent forms was signed by Jacqueline B. Potts, mother, was witnessed by Deni Schultz, and was dated July 1, 1987.

An ultrasound was performed on Potts by Schultz, and Dr. Kelly reviewed it and made a report. Thereafter, the amniocentesis was performed. Dr. Bazi[4]

---

"I have requested that a chromosomal analysis for my unborn fetus be performed. I understand that the cells required for this analysis are obtained in amniotic fluid by a transabdominal amniocentesis procedure which involves penetration of the mother's abdominal (stomach) and uterine (womb) walls by hypodermic needle. I hereby authorize Dr. Kelly to perform this transabdominal amniocentesis.

"The following have been explained to me:

"1. That although transabdominal amniocentesis is a widely used technique and the likelihood of complications for the mother or the fetus is extremely small (0.5% or less), there still is a possibility that the procedure will cause some injury to the mother or the fetus or start premature labor which may produce a miscarriage. Additional risks of the procedure are: infection, bleeding, leakage of fluid [.]

"2. That the attempt to do an amniocentesis may by unsuccessful.

"3. There may be technical problems of the cell culture of chromosome preparation which prevent interpretation of results.

"4. That although the likelihood of a misinterpretation of the chromosome karyotypes in this case is considered to be extremely small, a complete and correct diagnosis of the condition of the fetus on the karyotypes obtained cannot be guaranteed.

"I acknowledge that all my questions concerning this procedure have been answered satisfactorily, that I have read this entire document and that all blank spaces have been either completed or crossed off prior to my signing."

3. "INFORMED CONSENT FOR TRANSABDOMINAL AMNIOCENTESIS NEURAL TUBE DEFECTS

"I have requested that an alpha-fetoprotein analysis on my unborn fetus be performed. I understand that the amniotic fluid required for this analysis be obtained by a transabdominal amniocentesis procedure which involves penetration of the mother's abdominal and uterine (womb) walls by hypodermic needle. I hereby authorize Dr. Kelly to perform this amniocentesis.

"The following points have been explained to me:

"1. That although transabdominal amniocentesis is a widely used technique and the likelihood of danger to the mother or fetus is extremely small (0.5% or less), there still is a possibility that the procedure will cause some injury to the mother or the fetus or start premature labor which may produce a miscarriage. Additional risks of this procedure are: infection, bleeding, leakage of fluid.

"2. That the attempt to do an amniocentesis may by unsuccessful.

"3. That the finding of a high alpha-fetoprotein value will strongly suggest but not prove the presence of a fetal neural tube defect.

"4. That the finding of a normal value of alpha-fetoprotein will strongly suggest but not entirely rule out a fetal neural tube defect.

"5. In the case of presently undiagnosed twins, the results of this test will pertain to only one of the twin pari.

"I acknowledge that all my questions concerning this procedure have been answered satisfactorily, that I have read this entire document and that all blank spaces have been either completed or crossed off prior to my signing."

4. Although the consent forms signed by Potts indicated that Kelly would perform the amniocentesis, Potts was told that Bazi would be performing the procedure under Kelly's

stuck a needle into Potts's abdomen, through the top portion of her uterus and into the amniotic fluid. Approximately twenty-five c.c. of clear amniotic fluid was retrieved, and the needle was immediately pulled out. The amniotic fluid was then placed into two vials, taken to the lab, and tests were performed. After the amniocentesis was completed, the fetus was observed to ensure that it was still moving and that the heart was beating at a normal rate. In this case, the fetus exhibited normal cardiac activity, and Potts exhibited no ill effects, but seemed relieved the procedure was over.

On July 2, 1987, around 7:00 p.m., Potts went to Christ Hospital complaining of a fever, cough, malaise, and localized abdominal tenderness at the sight of the amniocentesis, with mild cramping. She was admitted to Labor and Delivery where she experienced increasing uterine tenderness and contractions. It was presumed she had chorioamnionitis, an infection, and she was given antibiotics. Around 11:30 p.m., Potts complained of shortness of breath, chills, and leakage. A cervical exam showed that Potts was dilated and, at 12:37 a.m. on July 3, 1987, Potts delivered a nonviable male child whose appearance was normal. Because Potts was experiencing respiratory distress and hypertension, she was transferred into critical care, where her respiratory difficulties increased. She remained on antibiotics even though there was no evidence of chorioamnionitis at the time of the baby's delivery.[5]

Over the next few days, Potts remained feverish and her chest x-ray showed she had respiratory distress syndrome, which later escalated into pneumonia. On July 7, 1987, Potts's chest x-ray suggested a possible fluid overload or amniotic fluid embolization as causes for her respiratory problems. Because Potts continued to spike fevers, it was believed that her condition continued to deteriorate due to an infection in her pelvis. Potts underwent an exploratory laparotomy, which resulted in a total abdominal hysterectomy with bilateral salpingo-oophorectomy being performed. After the operation, Potts's respiratory status deteriorated and she died on July 19, 1987. Potts's autopsy stated the following pathologic diagnoses:

"1. Status post spontaneous abortion with acute chorioamnionitis, post operative status amniocentesis.

"2. Amniotic fluid embolism and diffuse alveolar damage.

"3. Bilateral acute and organizing pneumonia with abscess formation.

"4. Recent hysterectomy and bilateral salpingo-oophorectomy.

---

direction. Part of Kelly's responsibility as a professor at the University of Cincinnati was to train residents in certain obstetrics procedures.

5. A pathology examination of the placenta after delivery confirmed acute chorioamnionitis.

"5. Acute tubular necrosis, kidneys.

"6. Centrilobular congestion and necrosis, liver."

It was the coroner's opinion that Potts died of "sepsis and acute pneumonia due to acute chorioamnionitis, post operative status amniocentesis."

On July 18, 1988, appellant, James E. Bedel, administrator of Potts's estate, filed a complaint in the Hamilton County Court of Common Pleas against the University of Cincinnati Hospital, Holmes Hospital Division; University OB/GYN Associates, Inc.; and Dr. Kelly.[6] On January 2, 1990, appellant filed the instant action in the Court of Claims against the University of Cincinnati Hospital. On February 14, 1990, this case was stayed pending final disposition of the common pleas case in Hamilton County.

On May 1, 1990, Dr. Kelly and University OB/GYN Associates, Inc. filed a motion for summary judgment, which the common pleas court granted. The decision was appealed and, in *Bedel v. Univ. OB/GYN Assoc., Inc.* (1991), 76 Ohio App.3d 742, 603 N.E.2d 342, the court determined that, as a matter of law, Potts was informed of and consented to Dr. Bazi's performing the amniocentesis. However, the court also found that genuine issues of material fact existed as to whether Dr. Kelly failed to disclose a material risk of the amniocentesis, amniotic fluid embolism, to Potts and also whether that risk materialized and was the proximate cause of Potts's death.

On November 12, 1992, appellant contacted the Court of Claims, requesting that the stay order be vacated so that the court could determine, pursuant to R.C. 9.86 and 2743.02(F), whether or not Dr. Kelly was entitled to immunity. On April 7, 1993, the Court of Claims filed an entry in which it found that Dr. Kelly was entitled to immunity under R.C. 9.86 and, as a result, the common pleas court did not have jurisdiction over a cause of action arising from his acts. On January 13, 1994, appellant voluntarily dismissed his cause of action in the common pleas court with prejudice. An entry vacating the stay of proceedings in the Court of Claims was filed on February 1, 1994.

A trial on the issue of liability was held in the Court of Claims on September 14, 1994. In a decision filed January 17, 1995, the court found that the University of Cincinnati Hospital was not entitled to the presumption of validity, set forth in R.C. 2317.54, regarding the three consent forms Potts signed. Nevertheless, the court found that Potts consented to and signed papers authorizing the amniocentesis procedure and that, simply because Dr. Bazi and not Dr. Kelly performed the amniocentesis, Potts's consent was not revoked. The court then determined,

---

6. Neither the University of Cincinnati Hospital nor Kelly was named in the original complaint filed in the Hamilton County Court of Common Pleas; however, on September 27, 1988, the complaint was amended to include them as parties.

as a matter of law, that Potts consented to the amniocentesis. On the issue of whether or not Potts gave legally sufficient informed consent, the court found that appellant failed to prove the three elements of the tort of lack of informed consent outlined in *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, by a preponderance of the evidence. As a result, the court entered judgment in favor of the University of Cincinnati Hospital.

Appellant now brings this appeal, asserting the following assignments of error:

"FIRST ASSIGNMENT OF ERROR

"The trial court erred as a matter of law by entering judgment in favor of defendant, after holding that defendant violated the provisions of O.R.C. 2317.54, based on its contradictory finding that the decedent consented to the amniocentesis.

"SECOND ASSIGNMENT OF ERROR

"The trial court erred by finding, contrary to the manifest weight of the evidence, that plaintiff failed to prove a battery.

"THIRD ASSIGNMENT OF ERROR

"The trial court erred as a matter of law by finding that the tort of lack of informed consent was not proved, based on its erroneous application of the standard of proving the materiality of the risks of the amniocentesis procedure, under *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, paragraph one of the syllabus.

"FOURTH ASSIGNMENT OF ERROR

"The trial court erred by finding, contrary to the manifest weight of the evidence, that plaintiff failed to prove the three elements of the tort of lack of informed consent."

Appellant's first and second assignments of error are related and will be considered together. In these assignments of error, appellant asserts that the trial court erred in determining that Potts consented, either by the three consent forms she signed, or orally, to having the amniocentesis performed by Dr. Bazi. Specifically, appellant asserts that Potts's written consent was invalid because the forms failed to name the physician who actually performed the procedure. In addition, appellant contends that the record contains no evidence that Potts orally agreed to permit Dr. Bazi to perform the amniocentesis instead of Dr. Kelly.

In *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 653 N.E.2d 226, the court adopted the modern application of the doctrine of *res judicata* as stated in 1 Restatement of the Law 2d, Judgments (1982), Sections 24–25, and held "that a valid, final judgment rendered upon the merits bars all subsequent actions

based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Id.* at 382, 653 N.E.2d at 229. In *Girard v. Trumbull Cty. Budget Comm.* (1994), 70 Ohio St.3d 187, 638 N.E.2d 67, the court stated that collateral estoppel precludes the relitigation of an issue that has actually and necessarily been litigated and determined in a prior action.

The issues appellant asserts in the first and second assignments of error were previously addressed by the Hamilton County Court of Appeals in *Bedel*, wherein the court stated, 76 Ohio App.3d at 745, 603 N.E.2d at 344:

" * * * While we agree that the consent forms do not accurately reflect the appropriate name and, for this reason, are not entitled to the presumption of validity afforded by R.C. 2317.54, we are not persuaded that such a deviation is sufficient to give rise to a triable claim of lack of an informed consent under the circumstances of the present case. Even if we assume that identity is a factor relevant to liability under the standard of *Nickell v. Gonzalez, supra,* Dr. Kelly indicated in his affidavit that he consulted with the decedent prior to the amniocentesis and that she was informed, at that time, that Dr. Bazi would be performing the procedure. Since the plaintiff has not offered evidence to controvert the testimony of Dr. Kelly and since informed consent can also be provided orally, *Cardinal v. Family Foot Care Centers, Inc.* (1987), 40 Ohio App.3d 181, 532 N.E.2d 162, we conclude that the decedent, as a matter of law, was informed of and consented to Dr. Bazi's performance of the amniocentesis."

Because these issues advocated to this court have already been determined by another tribunal, this court finds that *res judicata* and collateral estoppel bar appellant from relitigating these same issues a second time in this court. Accordingly, appellant's first and second assignments of error are not well taken.

Appellant's third and fourth assignments of error are related and will be considered together. In these assignments of error, appellant asserts that the trial court erred in determining that he did not establish the three elements of the tort of lack of informed consent by a preponderance of the evidence.

The doctrine of informed consent is based on the theory that every competent human being has a right to determine what shall be done with his or her own body. *Siegel v. Mt. Sinai Hosp.* (1978), 62 Ohio App.2d 12, 16 O.O.3d 54, 403 N.E.2d 202. The law of informed consent has never required that the physician, prior to administering the treatment, fully inform the patient of all the potential risks. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 17 O.O.3d 98, 407 N.E.2d 490. Rather, the proper standard of disclosure is reflected in *Nickell*, which held at the syllabus:

"The tort of lack of informed consent is established when:

"(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

"(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

"(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."

In *Nickell*, the court stated that one of the dilemmas in applying this test is the question of how far a doctor must go in establishing whether a potential danger, no matter how unlikely, is sufficiently material to require disclosure. To make this determination, the reasonable patient standard is used: a risk is material when a reasonable person, in what the physician knows or should know to be the patient's condition, would be likely to attach significance to the risk or risks in deciding whether or not to have the proposed treatment. Ordinarily, the issue of whether the physician has employed the requisite standard of care must be determined from the testimony of experts. *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541, 602 N.E.2d 423. The weight of conflicting expert evidence and the credibility of the experts are matters peculiarly for the trier of fact. *Hubach v. Cole* (1938), 133 Ohio St. 137, 10 O.O. 187, 12 N.E.2d 283.

Appellant's expert, Dr. Nicholas Criares, has been a physician since 1960 and is board certified in obstetrics and gynecology and medical quality assurance. Since 1978, Dr. Criares has been affiliated with the Bronx Psychiatric Center, which is affiliated with the Albert Einstein College of Medicine, Department of Psychiatry, where he is a primary care physician. Throughout his practice, he has performed fifty to one hundred amniocentesis procedures, the last one being in 1978. In addition, he has not performed an ultrasound or delivered a baby since 1978.

Dr. Criares testified that an amniotic fluid embolism is a risk of amniocentesis that should be disclosed to a patient who is considering having an amniocentesis. Dr. Criares's opinion was based on Danforth's textbook of Obstetrics and Gynecology, which states that an amniotic fluid embolism is a risk factor of an amniocentesis. Dr. Criares himself has seen only one amniotic fluid embolism in his years of practice, and it occurred in 1963 when a patient was having a very difficult labor. Dr. Criares also stated that this particular case with Potts was the only case of which he was aware where a maternal death occurred from an amniotic fluid embolism as a result of having an amniocentesis. Dr. Criares was

not aware of any other case studies where an amniocentesis resulted in an amniotic fluid embolism.

Regardless, even though the other literature on which he relied, Current Obstetrics and Gynecology Diagnosis and Treatment, did not mention that an amniotic fluid embolism was related to an amniocentesis but, rather, was related to peripartum respiratory distress, meaning occurring at or around the time of the delivery of the baby, and even though the incidents, in general, of an amniotic fluid embolism between 1968 and 1973 were "1 to 47,300 to 1 to 63,500," Dr. Criares testified that Potts still should have been informed that an amniotic fluid embolism was a risk associated with an amniocentesis. In addition, this risk should have been documented on the amniocentesis consent forms which Potts signed.

Dr. Criares opined that Potts developed an amniotic fluid embolism around 11:30 p.m. or midnight on July 2 while she was in labor. Dr. Criares stated that, although the respiratory and cardiovascular collapse that is associated with amniotic fluid embolism can occur immediately, it can also be a chronic thing as well. In Dr. Criares's opinion, Potts's amniotic fluid embolism was chronic.

Appellee's expert, Dr. Harlan Giles, is professor and chairman of the Department of Obstetrics and Gynecology for the Medical College of Pennsylvania and for Algee General Hospital, which is the chief teaching hospital in Pittsburgh. He is also a clinical professor at the University of West Virginia, where he teaches prenatal diagnosis, ultrasound, genetics, fetal testing and analysis of birth defects, including counseling. He also works with high risk patients, including those with diabetes and high blood pressure. He is board certified in obstetrics and gynecology and subspecialty board certified in fetal medicine. Dr. Giles has been licensed to practice medicine since 1969 and, in his career, has performed more than five thousand amniocenteses.

Dr. Giles testified that the reasonably known risks of amniocentesis that a physician would discuss with his patient prior to her undergoing the procedure were the risk of loss of the pregnancy, although this chance is small, as well as bleeding, loss of fluid in small amounts, and infection. In discussing Potts's amniocentesis, Dr. Giles stated that there was sufficient evidence that Potts was given ample informed consent of all of the usual or customary risks and complications that might accompany the procedure. In addition, Dr. Giles stated that the three consent forms given to Potts actually exceed the usual or customary standard of care. Dr. Giles also opined that there was absolutely no requirement to inform a patient that an amniotic fluid embolism is a risk factor associated with an amniocentesis. In fact, Dr. Giles stated that an amniotic fluid embolism is not even presented as a risk factor for women in labor because the

risk is so remote and so small that it should not affect the ordinary individual's ability to make a decision about a procedure.

Dr. Giles described the clinical signs of an amniotic fluid embolism as being virtually immediate and generally include respiratory distress, obstruction to the circulation to the lungs, shock, drop in blood pressure, heart failure, seizures, and the failure of the mother's blood to clot. Like Dr. Criares, Dr. Giles has never seen an amniotic fluid embolism occur as a result of an amniocentesis. Dr. Giles has also never heard of one happening to a patient following an amniocentesis, nor had he ever heard of a mother dying as a result of an amniocentesis. Dr. Giles stated that ninety-five percent of amniotic fluid embolisms occur during delivery, whether vaginal or caesarean, or during a second trimester miscarriage and passage of the fetus. Thus, the risk is well under one in a million or one in several million.

Dr. Giles opined that Potts developed an amniotic fluid embolism around midnight of July 2, while she was in labor. However, when asked whether the amniocentesis proximately caused Potts's amniotic fluid embolism, Dr. Giles stated that "to an overwhelming degree of medical probability or certainty, the amniocentesis performed on July 1st was not causally associated with the amniotic fluid embolism which presented in the usual fashion suddenly around midnight of July 2nd/3rd." In fact, Dr. Giles opined that Potts would have sustained an amniotic fluid embolism regardless of whether or not she had the amniocentesis.

Dr. Kelly, who is now a staff perinatologist in the department of gynecology at Providence Hospital, also testified at trial. He is board certified in obstetrics and gynecology, in maternal-fetal medicine, and in quality assurance and utilization review. He also is an assistant professor at Wayne State University. In 1987, Dr. Kelly had performed approximately one thousand amniocentesis procedures and, at the time of the trial, he had performed over two thousand.

Dr. Kelly testified that an amniotic fluid embolism is not a reasonably known risk of an amniocentesis or of any other obstetrical procedure, including labor and caesarean section. However, he has read about and seen an amniotic fluid embolism occur during labor. He also stated that the Danforth textbook does not list amniotic fluid embolism as a risk of amniocentesis. Dr. Kelly also stated that discussing the possibility of the mother's mortality as a result of an amniocentesis was not necessary in providing information before the procedure because the chances of death are so low. In fact, Dr. Kelly explained that there is a higher risk of dying in pregnancy for other reasons than there is a chance of dying from having an amniocentesis. Dr. Kelly stated that, with regard to the amniotic fluid embolism, the symptoms Potts exhibited when she was admitted to the hospital on July 2, fever and malaise, are not symptoms of an amniotic fluid embolism.

Furthermore, when an amniotic fluid embolism occurs, it does so either immediately or within the next few minutes, not hours later.

■ Based on the testimony of the experts, this court finds that the trial court did not err in its determination that appellant did not prove the tort of lack of informed consent by a preponderance of the evidence, and this finding is not against the manifest weight of the evidence. The evidence shows that the risks associated with the amniocentesis procedure were disclosed to Potts. While Dr. Criares's opinion differed from those of Dr. Giles and Dr. Kelly, as to whether or not an amniotic fluid embolism was a risk associated with an amniocentesis, it was within the discretion of the trier of fact to determine which expert or experts were more credible. *Hubach.*

■ In addition, appellant failed to prove that the amniocentesis procedure was the proximate cause of Potts's death. All three experts stated that the evidence showed that the proximate cause of Potts's death was the amniotic fluid embolism that occurred around midnight of July 2/3 while she was in labor. Although Dr. Criares stated that the symptoms associated with an amniotic fluid embolism could be chronic, the overwhelming evidence is that, once an amniotic fluid embolism occurs, the symptoms associated with it are instantaneous. Thus, it is highly unlikely that the amniocentesis procedure that took place on July 1 caused Potts to have an amniotic fluid embolism. Rather, Potts went into premature labor, a risk that was disclosed to her, and, during that labor, she experienced an amniotic fluid embolism. None of the experts had ever seen or heard of an amniocentesis causing an amniotic fluid embolism, while all three had experienced an amniotic fluid embolism occurring during labor.

Because the evidence demonstrates that the chance of an amniotic fluid embolism occurring as a result of an amniocentesis was so remote, it is unlikely that a reasonable person would have attached significance to this risk. Therefore, it is unlikely that having this information would have influenced Potts's decision of whether or not to have the amniocentesis performed.

Since there is competent, credible evidence to support the trial court's decision, that appellant failed to prove all of the elements of the tort of lack of informed consent, it will not be reversed. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Accordingly, appellant's third and fourth assignments of error are not well taken.

Based on the foregoing, appellant's four assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

JOHN C. YOUNG and PETREE, JJ., concur.