OPINION
{¶ 1} Defendants-appellants, John M. McGregor, M.D. ("Dr. McGregor"), and the Department of Surgery Corporation, P.C., appeal from the judgment of the Franklin County Court of Common Pleas denying their motions for new trial and judgment notwithstanding the verdict in this medical malpractice action brought by plaintiffs-appellees, Thelma D. and John R. Badger.
 {¶ 2} In 1995, Mrs. Badger, a resident of Parkersburg, West Virginia, sustained a massive rotator cuff tear in her left shoulder as a result of an automobile accident. Mrs. Badger underwent an operation on her left shoulder and, subsequently, received shots in an attempt to alleviate pain. Some of these shots were in her neck. About three weeks later, Mrs. Badger developed a new pain in the middle of her back, between her shoulder blades. Mrs. Badger called her family doctor, Dr. Frank Schwartz, who referred her to Dr. Barry Louden. After performing diagnostic tests on Mrs. Badger, Dr. Louden advised Mrs. Badger that she had an infection in her spine. Subsequently, Mrs. Badger was transferred to The Ohio State University Hospital ("OSU Hospital") in Columbus, Ohio.
 {¶ 3} Upon her arrival at OSU Hospital, Mrs. Badger was under the care of Dr. McGregor, a neurosurgeon and her attending physician. Mrs. Badger was placed on the antibiotic medications vancomycin, gentamicin, and clindamycin. Dr. McGregor requested a consultation from an infectious disease specialist regarding Mrs. Badger. Dr. David Wininger recommended that the antibiotic gentamicin and clindamycin be discontinued, and they were. Mrs. Badger was then given vancomycin and ciprofloxacin. These medications were continued after Mrs. Badger's discharge from OSU Hospital. Mrs. Badger testified that, at the first hospital visit, she did not speak with Dr. McGregor about any of the medications she was taking; Dr. McGregor did inform her that she was going to be given an antibiotic. Dr. McGregor testified that he specifically discussed with Mrs. Badger the possibility of surgery for her condition. Dr. McGregor also testified that, although she was a candidate for surgery, it never became a necessity. In addition, Dr. McGregor testified that he discussed a particular type of biopsy with Mrs. Badger; however, Dr. McGregor testified that he never discussed the side effects of the antibiotics with Mrs. Badger.
 {¶ 4} Approximately 12 days after her discharge, Mrs. Badger developed a severe rash on her body. This resulted in Mrs. Badger's readmission at OSU Hospital under the care of her attending physician, Dr. McGregor, who requested another consultation from an infectious disease specialist. At some point, Mrs. Badger was no longer getting vancomycin and ciprofloxacin. The infectious disease specialist, Dr. Julie E. Mangino, recommended a particular amount of clindamycin and gentamicin for treatment of the spinal infection. Dr. Mangino testified at trial that she had recommended, in her consult note, 300 milligrams of gentamicin to be administered intravenously per day. The order was written for 500 milligrams of gentamicin per day. On her day of discharge, at her second visit, an order was written that Mrs. Badger receive 500 milligrams of gentamicin prior to the discharge. Dr. McGregor's testimony at trial indicates that he signed the prescription for Mrs. Badger's home use of 500 milligrams of gentamicin per day. As stated above, Dr. McGregor testified that he never discussed the side effects of the antibiotics with Mrs. Badger. Mrs. Badger was discharged from her second visit on May 22, 1998.
 {¶ 5} After her second discharge from OSU Hospital, Mrs. Badger continued to receive gentamicin until June 8, 1998, when she developed the condition that led to this lawsuit. The gentamicin was administered intravenously by "Option Care" at her home. Mrs. Badger described her condition as follows:
I couldn't walk straight. And just in a short period of time — it's so hard to explain. It was like everything bounced. Every step I took it was like the inside of my head bounced, which hurt the back of my neck * * *. And to this day you are all bouncing over there. I can't recognize you because your faces are all moving either sideways or up and down.
(Tr. at 523-524.)
 {¶ 6} When asked whether she was dizzy, Mrs. Badger responded as follows:
Dizzy is not quite the right word. It's like if you have ever as a child been on a, maybe not a merry-go-round, where you go on these swings and you go around faster and faster, when you stop, you're not really dizzy but you can't stand up straight and you have to kind of work a little bit to get your balance, except my balance never comes back. It never comes back. It's been that way now for more than four years.
(Tr. at 524.) Mrs. Badger developed vertical and lateral head shaking. Because of her condition, Mrs. Badger testified that she is unable to watch television, use a computer, read or drive an automobile.
 {¶ 7} On May 27, 1999, appellees filed their complaint against David A. Wininger, M.D., John M. McGregor, M.D., DMF of Ohio, Inc., and Department of Surgery Corporation, P.C. The complaint was amended to include Julie E. Mangino, M.D., as a party-defendant in the action. On September 14, 2000, the action was dismissed by agreement of the parties. Appellees re-filed the action on July 16, 2001, against the above-named defendants, alleging, inter alia, negligence and lack of informed consent. On August 15 and 16, 2002, defendants Julie E. Mangino, M.D., David A. Wininger, M.D., and DMF of Ohio, Inc., were dismissed with prejudice by the trial court.
 {¶ 8} On August 19, 2002, the case proceeded to trial with Dr. McGregor and the Department of Surgery Corporation, P.C., as the remaining defendants. On August 30, 2002, the jury returned a verdict for appellees in the amount of $141,000. The jury found that Dr. McGregor met the accepted standards of care for a neurosurgeon in his care of Mrs. Badger on the negligence claim, but found that Dr. McGregor had failed to obtain her informed consent when he "failed to discuss the potential side effects of gentamycin [sic] with Mrs. Badger." (See Jury Interrogatories No. 4 and 5.) On September 18, 2002, the trial court entered judgment for appellees and against appellants. Appellants filed a motion for a new trial, or, in the alternative, a judgment notwithstanding the verdict, arguing that the trial court erred when it submitted the informed consent instruction to the jury.
 {¶ 9} The trial court found the jury instruction on informed consent proper and rendered a decision denying these motions. Subsequently, appellees filed a motion for prejudgment interest. On January 27, 2003, the trial court entered a judgment denying the motion for prejudgment interest, as well as denying appellants' motion for a new trial, and, in the alternative, motion for judgment notwithstanding the verdict. Appellants now assign the following errors:
I. The trial court erred in giving the jury instruction on informed consent when the issue of informed consent was not raised during discovery or during the plaintiffs' case in chief.
II. The trial court erred in charging the jury on informed consent absent expert testimony.
 {¶ 10} Appellants' first assignment of error argues the trial court erred in submitting the issue of informed consent to the jury because the issue was not properly raised. Appellants argue that they were "blind-sided" by the submission of the issue of informed consent to the jury, and that they were prejudiced by the timing of the informed consent issue. According to appellants, there was no expert testimony on the issue of informed consent, and the issue did not arise until appellees submitted a proposed jury instruction. Appellants claim that the issue of informed consent was first suggested when Mrs. Badger was asked at trial about her knowledge of gentamicin. The following colloquy took place between appellees' counsel and Mrs. Badger:
Q. When you were at the hospital for the second visit and the gentamicin was prescribed, did Doctor McGregor at any time come up and talk with you and explain to you about gentamicin?
A. No.
Q. Did anybody?
A. No.
Q. Until your imbalance problems started, did you have any knowledge that gentamicin could bring about a vestibular disorder?
A. Oh, no.
Q. Had you been aware that gentamicin would have brought on this kind of a problem, would you have allowed them to give you that drug?
A. No.
MR. TODARO [counsel for defendants]: Your Honor, I'm going to object because informed consent is not a part of this case.
THE COURT: I'll sustain the objection.
The jury is to disregard that comment.
(Tr. at 537.)
 {¶ 11} Appellants seem to argue that the court's ruling on their objection indicates that informed consent was not part of appellees' case at that point in the trial. We disagree with appellants. We note that appellees' informed consent claim was pled in the complaint. Also, testimony in depositions and during appellees' case-in-chief directly related to appellees' claim of lack of informed consent. We also note that appellees made reference to lack of informed consent in their opening statement and appellants failed to object. Therefore, appellants' argument that the jury instruction was erroneous because the issue of informed consent was not properly raised is not well-taken. Moreover, even though the trial court sustained appellants' objection relating to Mrs. Badger's initial informed consent testimony, the trial court was not precluded from charging the jury on informed consent, especially after it provided appellants with the opportunity to recall any witness. Based on the foregoing, appellants' first assignment of error is overruled.
 {¶ 12} Appellants' second assignment of error asserts the trial court erred as a matter of law in charging the jury on the tort of lack of informed consent because appellees had not presented sufficient expert testimony to establish the three elements of the tort of lack of informed consent. Specifically, appellants argue that "[t]he transcript is devoid of any opinion testimony to establish the three basic elements of the tort of lack of informed consent." (Appellants' brief at 9.) Appellants further assert that "[i]t is axiomatic that all medical malpractice cases require expert testimony on the issue of the standard of care of a reasonably prudent physician in the same or similar circumstances." Id. at 9-10, citing Bruni v. Tatsumi
(1976), 46 Ohio St.2d 127, 130.
 {¶ 13} "The law of informed consent has never required that the physician, prior to administering the treatment, fully inform the patient of all the potential risks." Bedel v. Univ. ofCincinnati Hosp. (1995), 107 Ohio App.3d 420, 427 ("Bedel I"), citing O'Brien v. Angley (1980), 63 Ohio St.2d 159. The Ohio Supreme Court outlined the standard of disclosure in Nickell v.Gonzalez (1985), 17 Ohio St.3d 136, syllabus:
The tort of lack of informed consent is established when:
(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.
 {¶ 14} Thus, pursuant to Nickell, appellees needed to present evidence showing: (1) that Dr. McGregor failed to disclose to Mrs. Badger and discuss with her the material risks and dangers inherently and potentially involved with respect to the use of gentamicin; (2) that the unrevealed risks and dangers "which should have been disclosed" by Dr. McGregor actually materialized and proximately caused her injury; and (3) a reasonable person in Mrs. Badger's position would have rejected the medication had these risks and dangers been disclosed to her. (Emphasis added.)
 {¶ 15} As to the first element of informed consent, that Dr. McGregor failed to disclose to Mrs. Badger the risks involved in the use of gentamicin, the evidence clearly established that Dr. McGregor did not discuss the medication with her. Dr. McGregor was Mrs. Badger's attending physician for her first and second visit to OSU Hospital. As Mrs. Badger's attending physician, Dr. McGregor had a duty, as a matter of law, to Mrs. Badger. SeeSchirmer v. Mt. Auburn Obstetrics Gynecologic Assoc.,155 Ohio App.3d 640, 2003-Ohio-7150, at ¶ 24, citing Bruni.
 {¶ 16} Appellants assert that, "[s]ince Dr. McGregor relied on the prescribing specialist to choose the proper antibiotic and to prescribe the proper dose, it follows that Dr. McGregor would have relied on Dr. Mangino to explain the risk and benefits to Mrs. Badger." (Appellants' brief at 7.) We disagree. Even if Dr. McGregor could rely on another doctor's recommendation as to such matters as the choice of drug and appropriate dosage of gentamicin for Mrs. Badger, Dr. McGregor was still the attending physician that prescribed gentamicin at Mrs. Badger's discharge. As such, he had the duty to inform Mrs. Badger as to any material risks relating to the gentamicin he prescribed. The fact that gentamicin may have been previously prescribed or recommended by another physician, such as an infectious disease specialist, does not eliminate Dr. McGregor's duty to inform Mrs. Badger of material risks.[1] Dr. McGregor's duty to inform, as the attending and prescribing physician, was separate from, and independent of, any duty to inform of a previously prescribing physician. Cf. Turner v. Children's Hosp., Inc. (1991),76 Ohio App.3d 541. Dr. McGregor, in his role as attending physician, prescribed the gentamicin medication for Mrs. Badger, and, thus, had the duty to inform.
 {¶ 17} We note that a physician only has a duty to disclose material information he knew or should have known. Thus, if the physician did not know of the risks, then expert testimony would be required to establish what he or she should have known. Here, Dr. McGregor was specifically asked about his knowledge of the side effects of gentamicin. Dr. McGregor testified that, at the time he was Mrs. Badger's attending physician, he was aware that gentamicin had certain side effects, and that damage to the vestibular system was one of those side effects. Therefore, the evidence indicates that Dr. McGregor knew of gentamicin's potential side effects when he was the attending physician for the care of Mrs. Badger at OSU Hospital in April and May of 1998, and when he prescribed gentamicin for the treatment of Mrs. Badger. Moreover, testimony at trial indicated that the side effects of gentamicin, including the possibility of vestibular damage, are well-known within the medical community.
 {¶ 18} The pivotal issue in this case, however, is whether appellees satisfied the second element of Nickell. On this point, expert testimony must be presented to prove "what a reasonable medical practitioner of the same school practicing in the same or similar communities under the same or similar circumstances would have disclosed to his patient about the risks incident to a proposed treatment, and of proving that the physician departed from that standard." Pierce v. Goldman (May 17, 1989), Hamilton App. No. C-880320; see, also, Bedel v. Univ.OB/GYN Assocs., Inc. (1991), 76 Ohio App.3d 742, 744 ("BedelII"); Turner, at 555; Reinhardt v. Univ. of Cincinnati Med.Ctr. (Dec. 13, 1994), Franklin App. No. 94API04-603; Bedel I,
at 428; West v. Cleveland Clinic Found. (June 15, 2000), Cuyahoga App. No. 77183.
 {¶ 19} Appellees, through expert testimony, presented evidence as to the risks of gentamicin, the probability and severity of potential risks, as well as the nature, availability, and risks of any alternatives. Multiple experts testified at trial as to the possible adverse side effects of gentamicin. For example, Dr. Mangino, a medical doctor certified as a specialist in internal medicine and infectious diseases, testified that the two key side effects associated with gentamicin are kidney problems and vestibular damage. Gentamicin can cause damage to the inner ear nerve balance cells. Dr. Darwin E. Zaske, a pharmacy professor at the University of Minnesota, testified as to the probability of complications arising from the use of gentamicin. Testimony at trial indicated that gentamicin is used to combat gram-negative bacteria, and that other medications have an effect on gram-negative bacteria. Moreover, Dr. Lloyd Minor, who is board-certified in otolaryngology, testified that Mrs. Badger's "bilateral loss of vestibular function" was caused by the gentamicin. (Dr. Minor Depo. at 63.)
 {¶ 20} Multiple experts testified as to the option of performing a biopsy that may have enabled the identification of the cause of Mrs. Badger's infection. Experts provided conflicting testimony as to whether the standard of care in this case required a biopsy to be performed. Experts also testified about the risks and benefits of a biopsy in this case, which included testimony on the probability of the risks manifesting and the success rate of the procedure.
 {¶ 21} Dr. Martin Raff, an internal medicine and infectious disease specialist, testified on the subject of choosing the proper antibiotics for treating a bacterial infection, as well as the risks and benefits associated with the use of gentamicin. Dr. Raff specifically stated that "anyone who's treated for three weeks or longer who's over the age of fifty, you can literally predict that they are going to have eighth nerve damage." (Tr. at 308.) Dr. Raff also discussed antibiotic alternatives to gentamicin, which, in his opinion, would have been "highly effective" in the treatment of Mrs. Badger's infection, as well as less toxic than gentamicin. (Tr. at 308-310.)
 {¶ 22} However, despite all of this expert testimony, none of the experts testified that the risks of gentamicin were those that should have been disclosed and that, by failing to inform Mrs. Badger of the risks of gentamicin, Dr. McGregor did not conform to the standard of care of a reasonably prudent physician in the same or similar circumstances as required by Nickell.
Although some of their testimony suggests that, if asked, they might have agreed that Dr. McGregor's failure to inform Mrs. Badger of the risks of gentamicin fell below the proper standard of care, none of the experts were asked this critical question.
 {¶ 23} The lack of expert testimony on the issue of deviation from the standard of care resulted in appellees' failure to meet the burden of proof of the second element of the lack of informed consent as set forth in Nickell. Thus, the trial court erred in charging the jury on lack of informed consent, and appellants' second assignment of error is sustained.
 {¶ 24} Based upon these considerations, appellants' first assignment of error is overruled, appellants' second assignment of error is sustained, and the judgment of the Franklin County Court of Common Pleas is reversed.
Judgment reversed.
Bowman and Watson, JJ., concur.
Petree, J., concurs in part and dissents in part.
[1] Although we are aware of no Ohio case directly standing for the proposition that a physician, by the mere act of signing a prescription, assumes a duty to obtain the patient's informed consent, the Ohio Supreme Court has suggested that such a duty would naturally flow from the physician-patient relationship, and that, by prescribing a medication or course of treatment, a physician knowingly consents "to act for the patient's medical benefit," thus giving rise to a duty of care. See Lownsbury v.VanBuren (2002), 94 Ohio St.3d 231, 238. In that case, the court outlined the problem of assessing liability in a case, such as ours, in which multiple physicians and other hospital personnel are responsible for patient care:
"* * * Unlike the traditional personalized delivery of health care, where the patient seeks out and obtains the services of a particular physician, the institutional environment of large teaching hospitals incorporates a myriad of complex and attenuated relationships. Here, the presenting patient enters a realm of full-service coordinated care in which technical agreements and affiliations proliferate the specialized functions and designated obligations of various allied health professionals. * * * When a patient enters this setting, he or she has every right to expect that the hospital and adjunct physicians will exercise reasonable care in fulfilling their respective assignments. * * *" Id. at 238-239.
The court went on to state that a finding of a physician-patient relationship giving rise to a duty of care may be established by evidence of the physician's knowing consent to such a relationship, and that such consent could be manifested by certain actions undertaken by the physician, such as "examining, diagnosing, treating, or prescribing treatment for the patient." (Emphasis added.) Id. at 240.