JOURNAL ENTRY AND OPINION
{¶ 1} William Maglosky, plaintiff-appellant, appeals from the jury's verdict in favor of Dr. Layton Kest, defendant-appellee. For the reasons that follow, we affirm.
 {¶ 2} The record before us demonstrates that Maglosky had been under the care of Dr. Teresa Ruch for back pain related to a herniated disk, and that Dr. Ruch was scheduled to perform surgery on Maglosky in November 2000. Prior to the surgery, Dr. Ruch obtained Maglosky's written informed consent, which provided in pertinent part as follows:
 {¶ 3} "I hereby authorize Dr. Ruch and whomever he/she may designate as his/her assistant, to perform upon William Maglosky the following procedures * * *: L4-5 laminectomy and fusion L4-S1 and consent to the performance of procedures in addition to or different from those now contemplated, whether or not arising from presently unforseen conditions, which the above named doctor or his/her assistants may consider necessary or advisable in the course of the procedure.
 {¶ 4} "* * *
 {¶ 5} "6. My doctor has also explained that, in performing the operation, he/she may use assistants, such as hospital residents or other physicians, nurses, or observers, and he/she has my consent to do so."
 {¶ 6} On Maglosky's scheduled surgery date, a nurse attempted to place a Foley catheter in him, but was unable to complete the procedure. The nurse thereafter contacted Dr. Kest, a urologist, for assistance. After unsuccessfully attempting the Foley catheterization, Dr. Kest tried to utilize a cystoscope, but was unable to do so. After partially filling Maglosky's bladder with liquid, Dr. Kest then performed a punch placement of a suprapubic catheter using a trocar. However, complications developed.
 {¶ 7} Because of the complications, Dr. Kest consulted with another urologist, Dr. Sanford Luria, who ultimately converted the procedure from a closed one to an open cystotomy. As a result of these complications, Maglosky was not able have his back surgery as scheduled. Maglosky subsequently developed a deep vein thrombosis and a pulmonary embolism.
 {¶ 8} Maglosky alleged that Dr. Kest failed to follow the acceptable standard of care in attempting to perform the catheterization and that he committed a battery by failing to obtain informed consent. The case proceeded to a jury trial. Both these issues were presented to the jury.
 {¶ 9} At trial, Maglosky called Dr. Kest as if on cross-examination. Dr. Kest testified that at the time the nurse summoned him to work on Maglosky, he was preparing one of his own patients for surgery, and interpreted the nurse's request as an emergency. Thus, he left his patient for over an hour to assist with Maglosky's catheterization. Dr. Kest explained that he deemed Maglosky's situation to be an emergency and was, in particular, concerned that Maglosky would not be able to void after his back surgery. Dr. Kest opined that Maglosky would need to void approximately two to four hours after the surgery and stated that it would be a "rare possibility" that Maglosky would be able to do so on his own. Thus, Dr. Kest testified that it would not have been a reasonable choice to wait until after Maglosky's back surgery and then bring him back into the operating room to catheterize him.
 {¶ 10} Dr. Michael Goodman testified as an expert on Maglosky's behalf, and stated that at the time Dr. Kest intervened, Maglosky's situation was not a "true" emergency, and that in such a situation, he would not have done the procedure without informing the patient or the patient's family. Dr. Goodman also testified that it was his opinion that Dr. Kest was negligent by performing the surgery when Maglosky's bladder was not completely full.
 {¶ 11} On cross-examination, Dr. Goodman admitted that if a patient is unable to urinate, a catheter must be placed in the patient at some time. Dr. Goodman testified that it was hard to know whether Maglosky would have had trouble urinating, but admitted that at his deposition he stated that it was "more likely than not" that Maglosky would have had trouble urinating. Dr. Goodman also testified that the suprapubic catheter, which was used by Dr. Kest, is best used in instances where there is inflammation and/or infection. Dr. Goodman further admitted that he has never filled a bladder with fluid before inserting a catheter as Dr. Kest did, and that it is not normal to wake a patient to inform them that a catheter is going to be placed.
 {¶ 12} Dr. Luria, who took over Maglosky's procedure from Dr. Kest, testified that there was a "good chance" that Maglosky would not have been able to urinate, and had the surgery occurred as scheduled, and without placement of the catheter, Maglosky would have had to have been brought back into the operating room after the surgery for a catheter to be placed.
 {¶ 13} Dr. Luria further testified that when a urologist is called into an operating room to place a catheter, it is a "semi-emergent situation." Dr. Luria explained semi-emergent as follows:
 {¶ 14} "Not life threatening. But I have to take into consideration if I awaken the patient, and they can't urinate, then I put them under another risk to bring them back later to catheterize them, and I have the problems of risk of further surgery, bleeding, infection. These are decisions we have to make at the time in these situations."
 {¶ 15} Dr. Luria testified that when he places a suprapubic catheter, he does not consult with the surgeon beforehand to determine whether the patient consented to such a catheterization. Rather, Dr. Luria explained that, in an emergent or semi-emergent situation, it is his practice to make the decision and then afterwards explain what occurred to the patient and/or the patient's family.
 {¶ 16} Maglosky and his fiancé also testified at trial. Maglosky testified that he only consented to the placement of a Foley catheter, which was attempted by the nurse. He stated that had he been informed about a suprapubic catheter, he would not have consented. His fiancé testified that she and Maglosky's mother were in the waiting room the entire time Maglosky was in surgery and no one came out to explain to them what was occurring and ask whether they consented to Dr. Kest placing a suprapubic catheter.
 {¶ 17} At the conclusion of Maglosky's case, the defense moved the court for a directed verdict. The court granted the defense's motion only as to plaintiff's claim for punitive damages.
 {¶ 18} Dr. Kest then testified on his own behalf. He reiterated his belief that Maglosky's situation was an emergency. He further explained that, in his experience, when a nurse seeks his assistance, it is upon instructions from the operating surgeon.
 {¶ 19} Dr. Martin Resnick, a urologist, also testified as an expert on Dr. Kest's behalf. In Dr. Resnick's opinion, at the time of Dr. Kest's intervention, the situation was "emergent." Dr. Resnick further testified that he believed the standard of care did not require Dr. Kest to wake Maglosky before going forward with the suprapubic catheterization and that Dr. Kest had injected Maglosky with a reasonable amount of fluid prior to performing the catheterization.
 {¶ 20} At the conclusion of the defense's case, Maglosky moved the court for a directed verdict as to Dr. Kest's defense that the within incident was an emergency situation, as well as to his claims of battery, lack of informed consent and failure to follow the standard of care. The court denied Maglosky's motion. The jury subsequently rendered a verdict in favor of Dr. Kest, and Maglosky now appeals.
 {¶ 21} In his first assignment of error, Maglosky claims that the trial court erred in not directing a verdict in his favor on his medical battery claim after Dr. Kest conceded that he performed surgery on Maglosky without his consent.
 {¶ 22} The appellate court conducts a de novo review of a judgment on a motion for directed verdict. Howell v. Dayton Power Light Co.
(1995), 102 Ohio App.3d 6, 13, 656 N.E.2d 957. Civ. R. 50(A)(4) sets forth the standard for granting a motion for directed verdict as follows:
 {¶ 23} "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." See, also, Limited Stores, Inc. v. Pan AmericanWorld Airways, Inc., 65 Ohio St.3d 66, 1992-Ohio-116, 600 N.E.2d 1027.
 {¶ 24} A battery is committed when a person unlawfully strikes another or touches another. Green v. Durgold (1950), 60 Ohio Law Abs. In a medical setting, when a physician treats a patient without his consent, the doctor has committed a battery. Estate of Leach v. Shapiro (1984),13 Ohio App.3d 393, 469 N.E.2d 1047. In contrast, a physician's acts are lawful when the patient expressly consents prior to medical treatment. Leach, supra, at 395.
 {¶ 25} The Leach case set forth the following general principles: (1) a physician who treats a patient without informed consent commits a battery, even if the treatment is harmless or beneficial; (2) absent legislation to the contrary, the patient's right to refuse medical treatment is absolute until the quality of competing interests is weighed in a court proceeding; (3) if a patient is not competent to consent to medical treatment, an authorized person may consent on the patient's behalf; (4) the patient's consent will be implied if the patient is unable to consent and there exists an emergency requiring immediate action to preserve the life or health of the patient; (5) consent to emergency medical treatment will not be implied if the patient has refused treatment in a manner that satisfies the same standards of knowledge and understanding required for informed consent; and (6) the existence of consent to medical treatment is a question of fact.
 {¶ 26} The extent to which a physician must disclose a risk and when that risk is material will require expert evidence concerning what a reasonable person would disclose. Turner v. Children's Hospital, Inc.
(1991), 76 Ohio App.3d 541, 548, 602 N.E.2d 423.
 {¶ 27} Upon review, we find that based upon the evidence presented at trial, reasonable minds could differ as to whether Maglosky consented to Dr. Kest's treatment and/or whether the situation was an emergency. Thus, the trial court did not err in denying Maglosky's motion for a directed verdict, the case was properly presented to the jury and his first assignment of error is without merit.
 {¶ 28} In his second assignment of error, Maglosky argues that the trial court erred in permitting Dr. Kest to present Dr. Resnick's expert testimony regarding the standard of care for obtaining informed consent. Specifically, Maglosky contends that "there is no standard of care analysis involved with battery claims." We disagree.
 {¶ 29} The doctrine of informed consent is based on the theory that every competent human being has a right to determine what shall be done with his or her own body. Siegel v. Mt. Sinai Hosp. (1978),62 Ohio App.2d 12, 403 N.E.2d 202. The law of informed consent has never required that the physician, prior to administering the treatment, fully inform the patient of all the potential risks. Bedel v. Univ. ofCincinnati Hosp. (1995), 107 Ohio App.3d 420, 427, 669 N.E.2d 9, citing O'Brien v. Angley (1980), 63 Ohio St.2d 159, 407 N.E.2d 490. Rather, the proper standard of disclosure was set forth by the Supreme Court of Ohio in Nickell v. Gonzalez (1985), 17 Ohio St.3d 136,477 N.E.2d 1145, at the syllabus:
 {¶ 30} "The tort of lack of informed consent is established when:
 {¶ 31} "(a) the physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
 {¶ 32} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
 {¶ 33} "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." See, also, Zarlinga v. Lampert (Feb. 26, 1998), Cuyahoga App. No. 72294.
 {¶ 34} This court has repeatedly held that "medical expert testimony is necessary to establish the significant risks which would have been disclosed to support the plaintiff's claim since the probability and magnitude of those risks is a matter of medical judgment beyond the knowledge of the lay person." Harris v. Ali (May 27, 1999), Cuyahoga App. No. 73432, citing Ratcliffe v. Univ. Hosp. of Cleveland (Mar. 11, 1993), Cuyahoga App. No. 61791, citing Ware v. Richey,14 Ohio App.3d 3, 7, 469 N.E.2d 899.
 {¶ 35} In West v. Cleveland Clinic Found. (June 15, 2000), Cuyahoga App. No. 77183, the plaintiffs argued that they did not need expert testimony to prove their claims for medical malpractice and lack of informed consent. This court disagreed, finding that expert testimony is required in all actions for medical malpractice, including those alleging lack of informed consent. We specifically stated:
 {¶ 36} "In order to prevail on a claim for lack of informed consent, medical expert testimony is necessary to establish the significant risks which would have been disclosed to support the plaintiff's claim since the probability and magnitude of those risks is a matter of medical judgment beyond the knowledge of the lay person." Id., citing Ratcliffe,
supra.
 {¶ 37} We noted further that "generally, the plaintiff has the burden of proving by expert medical evidence what a reasonable medical practitioner * * * would have disclosed to his patient about the risks incident to a proposed treatment, and of proving that the physician departed from that standard." Id., quoting Bedel, supra, at 744. Therefore, we concluded, "it is clear that medical malpractice claims, including those of lack of informed consent, require expert testimony." Id.
 {¶ 38} Because a plaintiff is required to provide testimony on the standard of care regarding informed consent issues, a defendant is permitted to provide rebutting testimony. Thus, there was nothing improper about Dr. Resnick's testimony regarding informed consent.
 {¶ 39} Accordingly, appellant's second assignment of error is overruled.
 {¶ 40} In his third and final assignment of error, appellant maintains that the trial court erred in permitting Dr. Resnick to testify beyond the bounds of his expert report in violation of Loc. R. 21.1. Maglosky specifically argues that Dr. Resnick's testimony that Dr. Kest faced an emergency, that this was not a battery, and his opinions regarding causation and reasonable care were improper.
 {¶ 41} Loc. R. 21.1 provides in pertinent part:
 {¶ 42} "(B) A party may not call an expert witness to testify unless a written report has been procured from the witness and provided to opposing counsel. It is counsel's responsibility to take reasonable measures including the procurement of all reports to ensure that each report adequately sets forth the expert's opinion. However, unless good cause is shown, all supplemental reports must be supplied no later than 30 days prior to trial. The report of an expert must reflect his opinions as to each issue on which the expert will testify. The expert will not be permitted to testify or provide opinions on issues not raised in his report."
 {¶ 43} Civ. R. 26 provides in pertinent part:
 {¶ 44} "(E) A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
 {¶ 45} "(1) A party is under a duty to reasonably supplement his response with respect to any questions directly addressed to (a) identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify."
 {¶ 46} In their application, both Loc. R. 21.1 and Civ. R. 26 permit a judge to exercise his or her discretion in the enforcement of a rule of discovery, and any sanctions accompanied with the non-compliance of Civ. R. 26(E). Laster v. Light (Mar. 16, 1995), Cuyahoga App. No. 66747, citing Cucciolillo v. East Ohio Gas Co. (1980), 4 Ohio App.3d 36,446 N.E.2d 175. Loc. R. 21.1 affords the judge the discretion to determine compliance, and in its absence, exclude the offending expert testimony.Pang v. Minch (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313. See, also,Weyls v. Univ. Hosp. (July 28, 1994), Cuyahoga App. No. 65803, unreported.
 {¶ 47} Upon review, we find that the trial court properly exercised its discretion in allowing Dr. Resnick's testimony. Contrary to Maglosky's assertions, Dr. Resnick's report did address standard of care issues. In particular, Dr. Resnick stated in his report that:
 {¶ 48} "It is not a standard of practice to wake up the patient when a catheter is required during surgery. This is a very common event and when a catheter cannot be placed, not infrequently, a Trocar catheter, as attempted by Dr. Kest, is carried out. Dr. Kest adhered to the standards of care regarding the treatment of Mr. Maglosky."
 {¶ 49} Moreover, Dr. Resnick testified at his discovery deposition that Dr. Kest acted in this case under emergency circumstances. Thus, even though Dr. Resnick's expert report makes no mention of an emergency situation, Maglosky was not unfairly surprised by Dr. Resnick's testimony at trial.
 {¶ 50} Accordingly, Maglosky's third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., Concurs, Celebrezze, Jr., J., concurs in judgment only.